# Exhibit F: Officer Arruda's Police Narrative from Cranston Police Report #21-58022-OF

Cranston Police Department
NARRATIVE FOR OFFICER EDWARD R ARRUDA
Ref: 21-58022-AR

Page: 1
08/01/2022

Entered: 10/21/2021 @ 1125
Modified: 10/21/2021 @ 1731
Approved: 10/23/2021 @ 0815

Entry ID: 409
Modified ID: 409
Approval ID: 421

**OFFICER'S SUPPLEMENTAL REPORT**
**21-58022-AR**
**OFFICER EDWARD R ARRUDA, #409**
**DATE/TIME :10/21/21 0831 HRS**

==========================================================================

On 10/21/21 at approx. 0828 hrs., I received a text message from Derek Gustafson, Dean of Students at WHMS, asking me if I could head over because of a parent issue. I informed him that SRO Rocchio was working. Derek responded that he just spoke to him. I contacted SRO Rocchio and informed him I would meet him there.

Upon my arrival to WHMS, I walked into the main hallway and observed a male subject who appeared to be upset. I asked him what was going on. He replied "nothing at all, these assholes won't give me my kid". I asked him what his name was, he replied, It's Josh, that's all your getting" At that point, Derek and WHMS Principal, Tim Vesey, walked up to us in the hallway. Mr. Vesey explained to me that the parent was there to take his daughter out of school because she had spilled something on her pants. The issue was that there was a Family Court Order in place. Josh interrupted him saying there's no court order, it's fucking bullshit, it's false information".

Mr. Vesey brought out a copy of the Family Court Order and presented it to Josh. Josh took the paperwork out of Mr. Vesey's hand and started to rip up the document before I grabbed it away from him. I advised Josh that he was being loud and tumultuous, and was close to being placed under arrest due to the fact the rest of the school could hear him. He told me he didn't care because he wants his daughter now. It was approx. 0836 when Mr Vesey put the school on Lockdown/Shelter in Place, due to Josh being loud and belligerant.

I picked up the ripped paperwork and advised Josh to relax and we'd work through this together once we get all the information. Josh told me that he didn't have to do anything I said. Josh stated he was getting "his better half", who was sitting in the car, to prove that the school didn't know what they were talking about. Josh walked to the doors and yelled for a female who was sitting in the vehicle, parked in the fire lane. The female walked towards the school, with her cell phone out video taping me. I acknowledged her recording me and explained to her how Josh was acting out of line. The female was later id to me as Rachel Ware, Josh's girlfriend.

The office staff had contacted the mother of the student on the phone. I spoke to Ms. Tonya Morena and asked if it ok for Josh to take their daughter out of school to change her clothes. She stated that she would allow it to keep the peace in the school. It was at this time I learned that "Josh" was Joshua Mello 3/18/75, who was arrested for Disorderly Conduct at Peter's Elementary in 2019, for being beligerant to the school staff. (Please refer to 19-61897-AR)

I walked back into the hallway and observed SRO Rocchio had arrived. SRO Rocchio was attempting to calm Josh Mello down with negative results. I mentioned the incident at Peter's School to him. Josh and Rachel denied the incident to me. I advised them that Tonya was allowing him to take their daughter home to clean up. Joshua yelled, "I don't need permission to take my kid out of school". I tried several times to explain that he was allowed to take his daughter but he didn't like the fact that the decision wasn't his. It was at this point we realized that Joshua was not going to calm down or listen to us, even though his child was going to be signed out to him.

Cranston Police Department
NARRATIVE FOR OFFICER EDWARD R ARRUDA
Ref: 21-58022-AR

Page: 2
08/01/2022

```
Entered:  10/21/2021 @ 1125        Entry ID: 409
Modified: 10/21/2021 @ 1731     Modified ID: 409
Approved: 10/23/2021 @ 0815     Approval ID: 421
```

Rachel and Joshua were near the front entrance door when they demanded to stand 6 feet away from them. Rocchio advised her that he didn't have to but they could leave on their own. Officer Rocchio attempted to grab Joshua's wrist to take him into custody. Joshua began to resist with Rachel in the middle of us. I attempted to grab Joshua's arm but was not able to due to Rachel Ware being in the way. I was able to get my arms around the back of Joshua's head, forcing him out of the main building, away from kids and staff. Myself and SRO Rocchio was able to wrestle him out of the main hallway and into the area between the two doors, while resisting the entire time, tucking his arms under his body. SRO Rocchio was able to get one arm free subsequently placing Joshua in handcuffs. As I called for a beat car and a supervisor, Joshua was attempting to spin away from SRO Rocchio while on the floor. I walked over and assisted getting Joshua back to his feet.

While escorting Joshua to the front of the building, he continued to verbally assault SRO Rocchio. Once we were at the front of my cruiser, Joshua was pushing his weight back at Rocchio, at which time SRO Rocchio pushed Joshua onto the hood of my cruiser. At one point SRO Rocchio pulled him away from the cruiser and sat him on the ground as Officer Dempsey was pulling up. Joshua was placed into the back of Officer Dempsey's cruiser. Joshua had a rug burn on the side of his forehead which CFD treated, ultimately transporting him to Roger Williams where Joshua refused treatment.

Mr. Vesey provided me with a copy of the Family Court Order C.A. no K10-0433M. Oder #3 states "**THAT NEITHER PARTY SHALL PICK THE MINOR CHILD UP PRIOR TO DISMISSAL WITHOUT WRITTEN AGREEMENT FROM THE OTHER PARTY**"

After the incident, I was reminded that Joshua Mello was escorted out of a School Committee meeting, that I was present for on 8/16/21, for blatantly disrupting the meeting. Please refer to Officer Rocchio's initial report

**OFFICER'S SUPPLEMENTAL REPORT**
**21-58022-AR**
Off.
Date/Time Report:

Cranston Police Department
NARRATIVE FOR OFFICER EDWARD R ARRUDA
Ref: 21-58022-OF

Page: 1
08/01/202...

| | |
|---|---|
| Entered: 10/22/2021 @ 1138 | Entry ID: 409 |
| Modified: 10/22/2021 @ 1149 | Modified ID: 409 |
| Approved: 11/01/2021 @ 1138 | Approval ID: 379 |

On 10/21/21 at approx. 0831 hrs., I responded to 400 Phenix Ave., WHMS, for an irate parent. After numerous de escalation attempts, the parent, Joshua Mello 3/18/75, was being arrested for Disorderly Conduct. During the arrest, Mr. Mello attempted to pull away from Officer Rocchio's wrist grab. I attempted to gain control of Mr. Mello's left wrist but it was blocked from his girlfriend who was standing in between us. I was able to gain control of the rear of Mr. Mello's head, and wrestled him down safely to the floor. There was a brief scuffle attempting to gain control of Mr. Mello's arm, which were buried under his prone body. We were able to place Mr. Mello in handcuffs.

Once the incident settled down, I started to feel a sharp pain in my right shoulder and a dull pain in my right hip when I walked. The shoulder pain persisted through the night and into the next day. I informed Sgt. Chapman immediately after the incident on 10/21 and spoke to Capt. Kite on 10/22. I am going to contact a Dr. to have it looked at. NFTR

** Portions of this report have been redacted **

# Exhibit G: Officer Rocchio's Police Narrative from Cranston Police Report #21-58022-OF

Cranston Police Department                                                          Page: 1
NARRATIVE FOR OFFICER JOHN P ROCCHIO                                           05/24/2022
Ref: 21-58022-AR

Entered: 10/21/2021 @ 1316       Entry ID: 435
Modified: 10/21/2021 @ 1748      Modified ID: 435
Approved: 10/23/2021 @ 0815      Approval ID: 421

---

**OFFICER'S FIRST REPORT**
**21-58022-AR**
OFFICER JOHN P ROCCHIO, #435
Date/Time Report: 10/21/2021 1316 hrs.

==================================================================================

On 10/21/21 at approx. 0829 hrs. I was contacted by ▮▮▮▮▮, the Assistant Principal at Western Hills Middle School, requesting I respond to the school. A few moments later, I spoke with SRO Arruda who informed me that he had been contacted as well and was responding there as well.

Upon arrival, I entered the school and observed two parties, later ID as Joshua Mello and ▮▮▮▮, in the lobby of the school, outside the main office. I observed Mello to be irate and pacing in close proximity to the entrance to the main office and Principal's office. He appeared to be recording the incident on a cell phone while he paced around the lobby. He was speaking loudly and over the school's administrators who were near the office door. After obtaining a face mask from the school, I tried speaking with Mello and ▮▮ to determine what the issue was. Upon doing so, Mello began to raise his voice and talk over me, waving his arm and pointing his finger at me and the administrators as well. I was able to ascertain that Mello was angry over a child custody issue involving his daughter. I approached them to attempt to learn more about the issue. While attempting to speak with them they both started to explain that the school had an invalid court order. Mello began to become more irate and aggressive. As an attempt to deescalate, I requested his name so that we could speak on a personal level. He only identified himself to me only as "Josh" and then added that that was all I was getting. ▮▮ did attempt to explain further but Mello continued to get louder. At one point during this interaction, Mello moved close to me in an attempt to obtain my badge number from my uniform shirt. I did verbally provide him with my badge number and name. While speaking with him I explained to him that he was being loud and disturbing the school and that his actions qualified as disorderly conduct. Every time I attempted to speak to Mello he began talking over me and refused to listen to me. He continued to become more aggressive and belligerent in his actions. During this time, a student entered the building and had to be ushered by and into the building. ↓ School was on lock down.

Officer Arruda approached where we were standing to explain to Mello that the school had received a verbal approval from his daughter's biological mother that he and ▮▮ could take his daughter from the school. ▮▮ did indicate that they would allow him to take his daughter once he calmed down. He apparently became more irate about the use of the word "allow." Yelling that we were not allowing him to do anything. We continued to attempt to calm him down so that his daughter could be brought down. These numerous attempts to calm him were unsuccessful. While this was occurring I observed two belt clips, which I believed to be part of pocket knives, in his front pocket. Mello began to back towards the doorway while ▮▮ attempted to speak him. ▮▮ continued to talk with Mello and moved him towards the doorway. She turned and began to plea with us to allow her to calm Mello down, turning her back to us and then him. Mello kept mentioning that he wanted me to back up to six feet, but I stated that I was not going to and that he could leave the building. At one point Mello began pointing at me and then began to move which is when ▮▮ put her hands on his chest to keep him from coming towards me. While she again tried to speak with him and had her back to me, Mello used his left hand to grab ▮▮ right shoulder, in an attempt to move her out of his way. Due to Mello's loud and tumultuous behavior, his increased belligerence and actions, as well as the fact I believed him to be in possession of two knives, I determined that I was going to take him into custody. I was unable to do this at this time because ▮▮ was positioned between us. I continued to keep myself in between Mello and the school

Cranston Police Department                                           Page: 2

NARRATIVE FOR OFFICER JOHN P ROCCHIO                                  05/24/2022

Ref: 21-58022-AR

Entered:  10/21/2021 @ 1316          Entry ID: 435
Modified: 10/21/2021 @ 1748          Modified ID: 435
Approved: 10/23/2021 @ 0815          Approval ID: 421

Rachel

lobby, while allowing him the access to exit the building. ▓▓ moved to her right, which allowed me the
opportunity to grab Mello's right wrist in an attempt to take him into custody. When I grabbed onto his arm, he
began to pull away from me as ▓▓ began to grab onto Mello's midsection. SRO Arruda began to assist me
taking him into custody. As we were doing this, Mello was taken to the ground in between the doors to the
schools.

Once on the ground, Mello continued to resist by placing his hands and arms under his body. I continued to give
him verbal commands to place his hands behind his back, but he did not comply. As this was occuring,
administrators had to prevent another parent from entering the building. I was eventually able to take control of
his left arm and place a handcuff on his wrist. Once this occured I was able to take control of right wrist and
place him in handcuffs. Once cuffed, Mello continued to be defiant. I moved him onto his side to remove the
knives from his pocket as SRO Arruda called for an Officer to respond to assist with transporting Mello. While I
did this, Mello was kicking his legs and started moving around on his side. These two knives were ultimately
removed from his pocket. I was able to see that there was another knife located between the waistband of his
pants and his waist, with the belt clip to this knife being concealed behind his belt. As I attempted to seize this
knife, he continued to kick his legs, turning himself around on his side. Mello then began attempting to stand up,
at which time I took him back to the ground. He was able to brace himself by placing his foot against wall. He
was yelling at me to get off of him and to let him go. He continued to kick his legs, at which time I grabbed hold
of his leg and arms and waited for him to calm down. I was able to secure all three knives in my pants pocket.
SRO Arruda and I were able to lift Mello to his feet before escorting him outside of the building.

As we escorted him to the area near the front of SRO Arruda's vehicle, Mello continued to be loud and
tumultuous, yelling at me. Once we reached the vehicle, Mello was placed facing it. When I began to do this,
Mello pushed his upper body back towards me, at which time I forced him forward, onto the hood of the vehicle.
I placed my left foot and lower leg around his right leg in a manner to keep him from moving further. He
continued to yell and argue while using his legs as leverage to push his upper body back
towards me. Due to his continuing resistive actions, I pulled him away from the vehicle and forced him to a
sitting position on the pavement. Once he was sitting on the ground, I placed my left leg behind his upper body
to prevent him from falling backwards further. Officer C. Dempsey arrived on scene and Mello was escorted to
her patrol vehicle. Prior to being placed in the rear of her vehicle, I completed a search incident to arrest on
Mello and no other contraband was located. *(Please refer to SRO Arruda's and Officer Dempsey's Supplemental
Narratives for Additional Information.)* SRO Davis and Sgt. Chapman arrived on scene as well.

I returned back to the school and spoke with ▓▓▓▓ regarding the incident. He informed me that they had
allowed Mello's daughter to leave the school with ▓▓ with the permission of the girl's biological mother. He
also informed me that the school had been placed in lock down as a result of Mello's behavior and actions. It was
explained to me that several staff members and administrators had witnessed his actions. I was able to obtain
written statements from six witnesses. *(Please refer to these Witness Statements for additional information.)* ▓▓▓
▓▓ also provided a Statement of Complaining Witness documenting the incident prior to the arrival of SRO
Arruda and I. He also indicates in his statement that he would like a Formal No Trespass Warning issued to
Mello for Western Hills Middle School and the grounds. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ I also received notification from the Cranston Public School Superintendent
Nota-Masse requesting that a formal No Trespass Warning be issued to Mello for the Briggs Administration
building as well.

Cranston Police Department

Page: 3

NARRATIVE FOR OFFICER JOHN P ROCCHIO

05/24/2022

Ref: 21-58022-AR

Entered: 10/21/2021 @ 1316          Entry ID: 435
Modified: 10/21/2021 @ 1748          Modified ID: 435
Approved: 10/23/2021 @ 0815          Approval ID: 421

Once back at CPD HQ, I checked the length of the knives. The first, a black Gerber knife, measured longer than 3". The other two knives, a black CRKT and a Husky razor knife, did not extend past 3 inches. These knives were photographed, logged as evidence and issued PR #'s 21-2835-PR, 21-2836-PR and 21-2837-PR, respectively and then secured in TL-13 with a CPD Property Form.

All written statements were placed in the transription bin, located in the roll call room.

NFTR

**\*\* Portions of this report have been redacted \*\***

# Exhibit H: Defendant, John Rocchio's Supplemental Response to Plaintiffs' Second Set of Interrogatories

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JOSHUA MELLO and RACHEL WARE,
*Plaintiffs,*

vs.

DEREK GUSTAFSON, TIMOTHY VESEY,
STEVEN CATALANO, JOHN ROCCHIO and
EDWARD ARRUDA
*Defendants*

C.A. No. 1:23-cv-00480-JJM-PAS;
1:23-cv-00479-JJM-PAS

## DEFENDANT, JOHN ROCCHIO'S SUPPLEMENTAL RESPONSE TO PLAINTIFFS' SECOND SET OF INTERROGATORIES

14.    In your Professional Standards investigation, you mentioned not communicating your intentions to another officer prior to engaging with Mr. Mello. Given that CPD's L.E.A.D.S. and L.O.C.K.U.P. training emphasizes officer communication for coordination and safety, please explain why this protocol was not followed, as this pertains to the adherence to safety and procedural training standards.

RESPONSE: Objection. Defendant objects based on the vague, ambiguous, and confusing nature of this interrogatory. Defendant objects to the extent that this interrogatory assumes facts that are in dispute. Defendant objects to the form of this interrogatory as it seeks information that calls for speculation. Notwithstanding and without waiving the objection, since this interrogatory fails to provide any context and/or further information regarding the statement "you mentioned not communicating your intentions to another officer prior to engaging Mr. Mello," I reasonably provide a complete response that explain of what I mentioned in my Professional Standards Investigation. In addition, since Cranston Police Department has a "Use of Force" Policy, but L.O.C.K.U.P. and L.E.A.D.S. are additional training and certification received outside of Cranston Police Department, I cannot explain any training called "CPD's L.E.A.D.S. and L.O.C.K.U.P. Training," as there is no training called "CPD's L.E.A.D.S. and L.O.C.K.U.P. Training."

**SUPPLEMENTAL RESPONSE: Defendant reincorporates and inserts the objections stated above. Notwithstanding and without waiving the objection, pursuant to Magistrate Sullivan's January 29, 2025 Order, Defendant was ordered to supplement this response to provide (1) Whether LEADS/LOCKUP training reflects a protocol emphasizing communication that was applicable to him as a Cranston Police Officer during the incident in issue; (2) If yes, whether you acted consistent with that protocol during the incident in issue; (3) If not, explain why. In response, Defendant provides that while some of the training that is used in L.O.C.K.U.P. and L.E.A.D.S. emphasizes communication between officers on scene, communication between the officers is not always required under the Cranston Police Department's policies given that an officer's response is based on the totality of the circumstances for that specific incident they are encountering. The L.E.A.D.S and L.O.C.K.U.P training are resources for officers to use in de-escalation attempts and to**

*Mello, et al, v. Derek Gustafson, et al*
*C.A. No. 23-cv-000480-JJM-LDA*

allow officers to use a reasonable level of force when dealing with subjects who are non-compliant. In this incident, Plaintiff Mello's increased aggression and the reasonable belief that he was in the possession of two (2) knives, lead Defendant to take action without communicating it to the other officer on scene. This was done due to the fact that the Defendant and the other officer were in close proximity to Plaintiff Mello and an attempt to communicate this with the other officer would have given Plaintiff Mello an opportunity to react and possibly access the knives that Plaintiff Mello had in his possession. Due to all of the factors listed above, Plaintiff Mello's behavior changing from passive resistance to defensive resistance and then to active aggression, as defined in the L.O.C.K.U.P. training, required that decisive force be taken. Defendant provides that all of his actions were consistent with Cranston Police Department's policies regarding Use of Force as well as the training provided in L.E.A.D.S., and L.O.C.K.U.P.

John Rocchio

STATE OF RHODE ISLAND
COUNTY OF *Providence*

*Subscribed and sworn to before me on this* 17th *day of* February *of 20*25.

NOTARY PUBLIC
My Commission Expires 6/21/25
ID# 76050



Edward Arruda and John Rocchio
By their Attorneys,

2

*Mello, et al, v. Derek Gustafson, et al*
*C.A. No. 23-cv-000480-JJM-LDA*

As to the objections,

/s/ Julia K. Scott- Benevides
Julia K. Scott- Benevides (#10408)
DeSisto Law LLC
4 Richmond Square, Suite 500
Providence, RI 02906
(401) 272-4442
julia@desistolaw.com

CERTIFICATION

I hereby certify that a true and accurate copy of the within was emailed and mailed, postage prepaid on the 18th day of February, 2025 to:

Joshua Mello
57 Rolfe Square, Unit 10113
Cranston, RI 02910
kskustomsrideons@gmail.com

Rachel Ware
57 Rolfe Square, Unit 10113
Cranston, RI 02910
kskustomsrideons@gmail.com

/s/ Julia K. Scott- Benevides

3

# Exhibit I: Defendant, Edward Arruda's Supplemental Response to Plaintiffs' Second Set of Interrogatories

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| JOSHUA MELLO and RACHEL WARE, <br> *Plaintiffs,* <br><br> vs. <br><br> DEREK GUSTAFSON, TIMOTHY VESEY, <br> STEVEN CATALANO, JOHN ROCCHIO and <br> EDWARD ARRUDA <br> *Defendants* | C.A. No. 1:23-cv-00480-JJM-PAS; <br> 1:23-cv-00479-JJM-PAS |

### DEFENDANT, EDWARD ARRUDA'S SUPPLEMENTAL RESPONSE TO PLAINTIFFS' SECOND SET OF INTERROGATORIES

14.    Please describe in detail the meaning of "I grabbed Mr. Mello, I put him head to head and I slowly descended to the floor, I took him down," specifically clarifying what "head to head" refers to, the technique used, and how you executed a "slow descent" while restraining Mr. Mello. Additionally, describe any standard Cranston Police Department procedures or training techniques followed during this action. This clarification is essential under *Graham v. Connor* to determine if reasonable force standards were met.

RESPONSE: Objection. Defendant objects to the confusing nature of this interrogatory. Defendant objects to the multi-part nature of this interrogatory. Defendant objects to the form of this interrogatory as it seeks information that calls for speculation. Defendant objects to this interrogatory as it seeks information regarding facts that may be in dispute. Defendant objects based on the vague and confusing nature of this interrogatory as it does not provide any context or information regarding the quote, "I grabbed Mr. Mello, I put him head to head and I slowly descended to the floor. I took him down." Notwithstanding and without waiving the objection, since the interrogatory fails to provide any context or information regarding the statement, "I grabbed Mr. Mello, I put him head to head and I slowly descended to the floor, I took him down," I am unable to describe and/or clarify any part of the statement. Also, without context or information regarding the statement, "I grabbed Mr. Mello, I put him head to head and I slowly descended to the floor, I took him down," I am unable to describe any Cranston Police Department procedures or training following during this action.

**SUPPLEMENTAL RESPONSE: Defendant reincorporates and inserts the objections provided above. Notwithstanding and without waiving the objections, Magistrate Sullivan's January 29, 2025 Order, which ordered Defendant to supplement his response by clarifying his testimonial reference (based on the actual testimony) to putting Plaintiff into a so-called "head to head" while descending to the floor, and to state whether and to what degree such testimony describes a technique or procedure that is the subject of any training he has received. In response, Defendant states Plaintiffs provided that the specific testimony that they are referring to is the portion of pg. 12 of my testimony during my interview for Plaintiff's Internal Affairs Complaint as to this incident provided,**

*Mello, et al, v. Derek Gustafson, et al*
*C.A. No. 23-cv-000480-JJM-LDA*

**Off. Arruda: So I attempted to call the child's mother in an attempt to help Mr. Mello out, because at this point I want him out of the building. But before I talked to the mother, he was explaining to me that his girlfriend was in the car and she could help with this, so I allowed him to bring somebody in to an already hostile situation, hoping she would calm him down. Right away, she started video taking, so I wanted the situation ended; I talked to mom on the phone and mom at the time told me that he's done this before and upon speaking to her, I realized that this was the same gentleman who had done something similar at Peters, but that didn't matter, because I just wanted the child and him out of the school, let them settle it and let her come back and…**

**Capt. Parker: If when you say the child and him out of school, if the ex-wife allowed or (inaudible)…**

**Off. Arruda: Yes, which she did, she, I wanted it to end, just let him take her.**
**Capt. Parker: Okay. So what happened next?**

**Off. Arruda: So I went out there and at that point, SRO Rocchio was already speaking with him and I don't know what he was speaking about, because I wasn't there, so as I approached them, I said Mr. Mello, your ex is allowing you to take your daughter and he didn't like that; he was like, it's my daughter, nobody allows me to do anything, I can do what I want, this is may daughter, and I reiterated the fact, I said, you understand, you're being allowed to take her out…**

**Capt. Parker: Right.**

**Off. Arruda: …let's do this. And he just didn't like the fact that I was allowing him to do anything, he wanted to be in control, I guess.**

**Capt. Parker: Right. Because at the time, his daughter was in the school facility, correct?**

**Off. Arruda: Yes.**

**Capt. Parker: Okay.**

**Off. Arruda: And at that point, I never saw the daughter, I didn't know what the real issue was with the daughter, other than she needed to change her clothes.**

**Capt. Parker: Okay. So, what happened next.**

**Off. Arruda: As we were getting closer to the door, they became more and more agitated and they had the phone in front of Rocchio, telling us to get**

*Mello, et al, v. Derek Gustafson, et al*
*C.A. No. 23-cv-000480-JJM-LDA*

**back, get back, six feet, six feet and Rocchio said something to the effect like I don't need to step back, like you're out of control here.**

**Capt. Parker: Right.**

**Off. Arruda: … you're not taking charge of the situation and at that point, Rocchio determined that I can't speak for Rocchio, but he went to grab his wrist and as he grabbed his wrist, Mello's girlfriend was kind of caught in the middle so I grabbed Mr. Mello, I put him head to head and I slowly descended to the floor, I took him down. There was no strikes, there wasn't a need of any strikes, we just brought him down and at that point, when he's on the ground, he was kicking, he was yelling, he was flopping all while the wife was standing over us, video taping and Rocchio alerted me that there were knives, he grabbed the knives and he kind of tossed them to the side, and I never touched the knives, at least to my recollection, it was Mr. Vesey that picked the knives up because I saw the video after from the school surveillance and he secured the knives.**

     **Plaintiffs also provided that Defendant discussed "head to head" during his trial testimony for Plaintiff Mello's criminal trial related to his October 21, 2021 arrest. In reviewing the provided trial "audio is labeled 2022-11-15_12.08.13.153.wmv and the time stamp is 47:28," it appears that Defendant testified that Defendant Rocchio warned Plaintiff Mello two (2) maybe three (3) times that he's going to be arrested and then Defendant Rocchio attempted to grab Plaintiff Mello's wrist to take him into custody. Defendant described that at this point, was to the left of Plaintiff Mello if you are looking at the vestibule door. It also appears that Defendant also described that Plaintiff Ware was in between Plaintiff Mello and Defendant Rocchio. Defendant further described that Defendant Rocchio was unable to grab his arm, and as a Defensive Tactics instructor Defendant put Defenant's head next to Plaintiff Mello's head because that was the only advantage Defendant could get over him. Finally, Defendant described as Defendant put his head next to Plaintiff Mello's head, Defendant and Defendat Rocchio brought Plaintiff Mello to the ground.**

     **To further clarify, Defendant Rocchio made an attempt to take Plaintiff Mello into custody, Defendant Rocchio attempted to take control of Plaintiff Mello's right arm, which prompted Plaintiff Mello to attempt to move his arm away. It was at this point, that Plaintiff Ware was in the middle of Plaintiff Mello and Defendant Rocchio, and it appeared to Defendant that Plaintiff Ware was grabbing at Officer Rocchio's grip around Plaintiff's right arm. Defendant attempted to get in between Plaintiff Ware and Plaintiff Mello, but was unable to. Due to the close proximity, Defendant was able to gain control of Plaintiff Mello by going "head to head" which was cradling Mr. Mello's head in between my head and left shoulder, and in a controlled descent, went to a knee to place Plaintiff down onto the carpet in the foyer of the front entrance of the school. I am trained in L.O.C.K.U.P and L.E.A.D.S. De-escalation Strategies and Tactical Options, which is training conducted related to close quarters to a suspect, which is utilized to help officers be efficient and safe in making an arrest. Given the totality of the circumstances in this situation with Plaintiffs, I was able to utilize skills that I learned though the L.O.C.K.U.P. and L.E.A.D.S. training to safely bring Plaintiff Mello to the ground.**

*Mello, et al, v. Derek Gustafson, et al*
*C.A. No. 23-cv-000480-JJM-LDA*

Edward Arruda

**STATE OF RHODE ISLAND**
**COUNTY OF** _____

*Subscribed and sworn to before me on this* 26th *day of* February *of 20*25.

NOTARY PUBLIC
My Commission Expires   9/23/2026

Defendants

Edward Arruda and John Rocchio
By their Attorneys,
As to the objections,

*/s/ Julia K. Scott- Benevides*
Julia K. Scott- Benevides (#10408)
DeSisto Law LLC
4 Richmond Square, Suite 500
Providence, RI 02906
(401) 272-4442
julia@desistolaw.com

<u>CERTIFICATION</u>

I further certify that a true and accurate copy of the within was emailed and mailed, postage prepaid on the 26th day of February, 2025 to:

4

*Mello, et al, v. Derek Gustafson, et al*
*C.A. No. 23-cv-000480-JJM-LDA*

Joshua Mello                          Rachel Ware
57 Rolfe Square, Unit 10113           57 Rolfe Square, Unit 10113
Cranston, RI 02910                    Cranston, RI 02910
kskustomsrideons@gmail.com            kskustomsrideons@gmail.com


*/s/ Julia K. Scott- Benevides*

5

# Exhibit J: Defendant, Edward Arruda's Response to Plaintiffs' Request for Admissions

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JOSHUA MELLO and RACHEL WARE,
                    *Plaintiffs,*

        vs.                                          C.A. No. 1:23-cv-00480-JJM-PAS;
                                                            1:23-cv-000479-JJM-PAS

JOHN ROCCHIO and
EDWARD ARRUDA
                    *Defendants*

## DEFENDANT, EDWARD ARRUDA'S RESPONSE TO PLAINTIFFS' REQUEST FOR ADMISSIONS

1. Admit that you knew about the events described in Plaintiff's Complaint before this lawsuit was filed.

**RESPONSE:** **Objection. Defendant objects to the extent that this request is vague, unclear and lacks specificity as required by Fed. R. Civ. P. Rule 36. Notwithstanding and without waiving the objections and to the extent that this request requires a response, Defendant denies this request.**

2. Admit that you were interviewed by Lauren Hayden about the incident that took place at Western Hills Middle School on 10/21/2021 and include the information that you provided her.

**RESPONSE:** **Objection. Defendant objects to the extent that this request is improper pursuant to Fed. R. Civ. P. Rule 36. Notwithstanding and without waiving the objection, and to the extent that this request requires a response, Defendant denies this request.**

3. Admit that you have documents relevant to claims and defenses in this lawsuit.

**RESPONSE:** **Admit.**

4. Admit that you are responsible for the actions of your agents and employees as described in Plaintiff's Complaint.

**RESPONSE:** **Objection. Defendant objects to the extent that this request is vague and confusing and does not relate to this Defendant. Notwithstanding and without waiving the objection, and to the extent that this request requires a response, Defendant denies this request.**

5. Admit that the Plaintiff suffered damages because of the events described in Plaintiff's Complaint.

*Mello, et al, v. Derek Gustafson, et al*
*C.A. No. 23-cv-000480-JJM-LDA*

**RESPONSE: Objection. Defendant objects to the extent that this request is vague, unclear and lacks specificity as required by Fed. R. Civ. P. Rule 36. Notwithstanding and without waiving the objection, and to the extent that a response is required, Defendant denies this request.**

6. Admit that you used force against the Plaintiff during the incident.

**RESPONSE: Admit.**

7. Admit that you used force consistent with the department's policies and procedures.

**RESPONSE: Admit.**

8. Admit that the Plaintiff sustained injuries as a result of the use of force.

**RESPONSE: Admit.**

9. Admit that there have been prior complaints against you regarding the use of force.

**RESPONSE: Objection. Defendant objects based on Rhode Island Law Enforcement Officers' Bill of Rights, to providing information on the subject of open investigations, if any, and those that have been closed after finding of innocence, unfounded, not sustained, and/or exonerated. Defendant objects to the extent that this request is vague and confusing. Notwithstanding and without waiving the objections, and to the extent that a response is required, Defendant denies this request.**

10. Admit that you have received training on the use of force.

**RESPONSE: Admit.**

11. Admit that you communicated with other officers about the incident before writing your report.

**RESPONSE: Admit.**

12. Admit that you followed the department's use of force policy during the incident.

**RESPONSE: Admit.**

*Mello, et al, v. Derek Gustafson, et al*
*C.A. No. 23-cv-000480-JJM-LDA*

Defendants
Edward Arruda and John Rocchio
By their Attorneys,

*/s/ Julia K. Scott- Benevides*
Julia K. Scott- Benevides (#10408)
DeSisto Law LLC
60 Ship Street
Providence, RI 02903
(401) 272-4442
marc@desistolaw.com
julia@desistolaw.com

CERTIFICATION

I hereby certify that the within document has been electronically filed with the Court on the 19th day of August, 2024, and is available for viewing and downloading from the ECF system.

I further certify that a true and accurate copy of the within was emailed and mailed, postage prepaid, to:

Joshua Mello                              Rachel Ware
57 Rolfe Square, Unit 10113               57 Rolfe Square, Unit 10113
Cranston, RI 02910                        Cranston, RI 02910
kskustomsrideons@gmail.com                kskustomsrideons@gmail.com

*/s/ Julia K. Scott- Benevides*

3

# Exhibit K: Defendant, John Rocchio's Response to Plaintiffs' Request for Admissions

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JOSHUA MELLO and RACHEL WARE,
                        *Plaintiffs,*

            vs.                                    C.A. No. 1:23-cv-00480-JJM-PAS;
                                                        1:23-cv-000479-JJM-PAS

JOHN ROCCHIO and
EDWARD ARRUDA
                        *Defendants*

## DEFENDANT, JOHN ROCCHIO'S RESPONSE TO PLAINTIFFS' REQUEST FOR ADMISSIONS

1. Admit that you knew about the events described in Plaintiff's Complaint before this lawsuit was filed.

**RESPONSE**: **Objection. Defendant objects to the extent that this request is vague, unclear and lacks specificity as required by Fed. R. Civ. P. Rule 36. Notwithstanding and without waiving the objections and to the extent that this request requires a response, Defendant denies this request.**

2. Admit that you were interviewed by Lauren Hayden about the incident that took place at Western Hills Middle School on 10/21/2021 and include the information that you provided her.

**RESPONSE**: **Objection. Defendant objects to the extent that this request is improper pursuant to Fed. R. Civ. P. Rule 36. Notwithstanding and without waiving the objection, and to the extent that this request requires a response, Defendant denies this request.**

3. Admit that you have documents relevant to claims and defenses in this lawsuit.

**RESPONSE**: **Admit.**

4. Admit that you are responsible for the actions of your agents and employees as described in Plaintiff's Complaint.

**RESPONSE**: **Objection. Defendant objects to the extent that this request is vague and confusing and does not relate to this Defendant. Notwithstanding and without waiving the objection, and to the extent that this request requires a response, Defendant denies this request.**

5. Admit that the Plaintiff suffered damages because of the events described in Plaintiff's Complaint.

*Mello, et al, v. Derek Gustafson, et al*
*C.A. No. 23-cv-000480-JJM-LDA*

**RESPONSE: Objection. Defendant objects to the extent that this request is vague, unclear and lacks specificity as required by Fed. R. Civ. P. Rule 36. Notwithstanding and without waiving the objection, and to the extent that a request is required, Defendant denies this request.**

6. Admit that you used force against the Plaintiff during the incident.

**RESPONSE: Admit.**

7. Admit that you used force consistent with the department's policies and procedures.

**RESPONSE: Admit.**

8. Admit that the Plaintiff sustained injuries as a result of the use of force.

**RESPONSE: Admit.**

9. Admit that there have been prior complaints against you regarding the use of force.

**RESPONSE: Objection. Defendant objects based on Rhode Island Law Enforcement Officers' Bill of Rights, to providing information on the subject of open investigations, if any, and those that have been closed after finding of innocence, unfounded, not sustained, and/or exonerated. Defendant objects to the extent that this request is vague and confusing. Notwithstanding and without waiving the objections, and to the extent that a response is required, Defendant denies this request.**

10. Admit that you have received training on the use of force.

**RESPONSE: Admit.**

11. Admit that you communicated with other officers about the incident before writing your report.

**RESPONSE: Admit.**

12. Admit that you followed the department's use of force policy during the incident.

**RESPONSE: Admit.**

*Mello, et al, v. Derek Gustafson, et al*
*C.A. No. 23-cv-000480-JJM-LDA*

                              Defendants
                              Edward Arruda and John Rocchio
                              By their Attorneys,


                              */s/ Julia K. Scott- Benevides*
                              Julia K. Scott- Benevides (#10408)
                              DeSisto Law LLC
                              60 Ship Street
                              Providence, RI 02903
                              (401) 272-4442
                              marc@desistolaw.com
                              julia@desistolaw.com


                        CERTIFICATION

        I hereby certify that the within document has been electronically filed with the Court on the 19th day of August, 2024, and is available for viewing and downloading from the ECF system.

        I further certify that a true and accurate copy of the within was emailed and mailed, postage prepaid, to:

Joshua Mello                        Rachel Ware
57 Rolfe Square, Unit 10113         57 Rolfe Square, Unit 10113
Cranston, RI 02910                  Cranston, RI 02910
kskustomsrideons@gmail.com          kskustomsrideons@gmail.com


                              */s/ Julia K. Scott- Benevides*

                              3

Exhibit L: (Pages 9-19) Office of Professional Standards OPS Case# 2023-12-IA Officer Arruda's interview with Captain Parker on March 1, 2023, about Complaints submitted to Cranston Police Department on July 3rd 2023 by Plaintiff Mello and Plaintiff Ware

## Witness Interviews and Statements

### *Complainant Joshua Mello*

As part of this investigation, I interviewed Mello at headquarters regarding his complaint. At the time of the interview, Mello's criminal charges were not yet fully adjudicated, so Mello would not answer any questions directly pertaining to the incident surrounding his complaint.

### *Interview of SRO Edward Arruda*

As part of this investigation, SRO Arruda was interviewed on March 1st, 2023. SRO Arruda stated he recalled this particular arrest, as he was working in his role as a school resource officer when this incident occurred and responded to the scene. SRO Arruda was questioned about this complaint and the allegations:

**Off. Arruda**:    I received a text message from the Administration at Western Hills that they had an irate parent in the school. They contacted me because I was closer than SRO Rocchio. After calling SRO Rocchio, I told him I'd be over there because I'd get there quicker than he would. So I responded there first.

**Capt. Parker**:    And then what happened when you got there?

**Off. Arruda**:    I walked in, I observed a male looking agitated, arms folded, just I could tell he had an edge to him, in the hallway of Western Hills Middle School. I asked him what the deal was and he pretty much told me it's none of my business. I asked him his first name, I asked him his name and he goes "It's Josh. That's all you're getting".

**Capt. Parker**:    What happened next?

**Off. Arruda**:    What happened next was I spoke to the Administrators who were saying that this gentleman was there to pick up his daughter but there was a Family Court Order in effect which stated that his ex-

OPS 23-12

Defendants- RFP- 000083

girlfriend/mother of the child he was attempting to pick up had to be notified before he could sign the child out.

**Capt. Parker**:  Okay and he was explained this and was upset, I assume?

**Off. Arruda**:  He was upset. The school was put in to lockdown due to his loud voice and being belligerent towards the staff, so at this point, around the time that I got there, the school was put on lockdown, or shelter in place.

**Capt. Parker**:  And that decision to put the school in shelter in place, was that your decision (inaudible)?

**Off. Arruda**:  That was the school's decision because it echoes throughout the hallways.

**Capt. Parker**:  Okay. So he was making such a scene that the school was put on lockdown and that decision was made by the school officials?

**Off. Arruda**:  Yes.

**Capt. Parker**:  Okay. Go ahead.

**Off. Arruda**:  Upon speaking with administrators, I attempted to get more information from Mr. Mello and he really wasn't giving me anything other than "this is all bullshit" what he has to go through just to get his kid out and when I asked, I believe it was Mr. Veasey if I could get a copy of the Family Court Order, he came out with it while I was talking with Mr. Mello and Mr. Mello grabbed it out of his hand and attempted to rip it up.

**Capt. Parker**:  Okay.

**Off. Arruda**:  And at that point, I warned him enough, you're being disorderly at this point.

**Capt. Parker**:  Okay.

**Off. Arruda**:  And I picked up the pieces off the floor.

**Capt. Parker**:  So there was some type if interaction, back and forth, over this document that was a Family Court Order…

**Off. Arruda**:  Yes.

OPS 23-12

Defendants- RFP- 000084

| | |
|---|---|
| **Capt. Parker**: | …and then… |
| **Off. Arruda**: | Mr. Mello didn't think that, he didn't have to abide by it. |
| **Capt. Parker**: | Okay. |
| **Off. Arruda**: | At this point, I had no idea what it was about. |
| **Capt. Parker**: | Okay. |
| **Off. Arruda**: | So I attempted to call the child's mother in an attempt to help Mr. Mello out, because at this point I want him out of the building. But before I talked to the mother, he was explaining to me that his girlfriend was in the car and she could help with this, so I allowed him to bring somebody in to an already hostile situation, hoping that she would calm him down. Right away, she started videotaping, so I wanted the situation ended; I talked to mom on the phone and mom at that time told me that he's done this before and upon speaking with her, I realized that this was the same gentleman who had done something similar at Peters, but that didn't matter, because I just wanted the child and him out of the school, let them settle it and let her come back and… |
| **Capt. Parker**: | If when you say the child and him out of the school, if the ex-wife allowed or (inaudible)… |
| **Off. Arruda**: | Yes, which she did, she, I wanted it to end, just let him take her. |
| **Capt. Parker**: | Okay. So then what happened next? |
| **Off. Arruda**: | So I went out there and at that point, SRO Rocchio was already speaking with him and I don't know what he was speaking about, because I wasn't there, so as I approached them, I said Mr. Mello, your ex is allowing you to take the daughter and he didn't like that; he was like, it's my daughter, nobody allows me to do anything, I can do what I want, this is my daughter and I reiterated the fact, I said, you understand, you're being allowed to take her out… |
| **Capt. Parker**: | Right. |
| **Off. Arruda**: | …let's do this. And he just didn't like the fact that I was allowing him to do anything, he wanted to be in control, I guess. |

OPS 23-12

Defendants- RFP- 000085

**Capt. Parker**:        Right.  Because at the time, his daughter was in the school facility, correct?

**Off. Arruda**:        Yes.

**Capt. Parker**:        Okay.

**Off. Arruda**:        And at that point, I never saw the daughter, I didn't know what the real issue was with the daughter, other than she needed a change of clothes.

**Capt. Parker**:        Okay. So then what happened next.

**Off. Arruda**:        As we were getting closer to the door, they became more and more agitated and they had the phone out in front of Rocchio, telling us to get back, get back, get back, six feet, six feet, six feet and Rocchio said something to the effect like I don't need to step back, like, you're out of control here…

**Capt. Parker**:        Right.

**Off. Arruda**:        …you're not taking charge of the situation and at that point, Rocchio determined that and I can't speak for Rocchio, but he went to grab his wrist and as he grabbed his wrist, Mello's girlfriend was kind of caught in the middle and so I grabbed Mr. Mello, I put him head to head and I slowly descended to the floor, I took him down. There was no strikes, there wasn't a need of any strikes, we just brought him down and at that point, when he's on the ground, he was kicking, he was yelling, he was flopping all while the wife was standing over us, videotaping and Rocchio alerted me that there were knives, he grabbed the knives and he kind of tossed them to the side and I never touched the knives, at least to my recollection, it was Mr. Veasey that picked the knives up because I saw the video after from the school surveillance and he secured the knives.

**Capt. Parker**:        Okay. So at the time he was brought to the ground, he was, was he instructed to leave the school and he basically wasn't and he was being…

**Off. Arruda**:        Prior to, we were kind of gearing him to leave the school, because he, this isn't working out, he was being loud.

OPS 23-12

Defendants- RFP- 000086

**Capt. Parker**:          Okay and was he requested, do you recall, to calm down or quiet his voice or anything like that?

**Off. Arruda**:          I attempted to deescalate Mr. Mello several times.

**Capt. Parker**:          Okay and then was he ever instructed to leave or were you trying to get him out with his daughter what…?

**Off. Arruda**:          I was trying to get him out with his daughter, that was my objective.

**Capt. Parker**:          Okay.

**Off. Arruda**:          He could leave but with his daughter.

**Capt. Parker**:          Yeah, okay, so the daughter, was the daughter here at this point?

**Off. Arruda**:          She was not visibly…

**Capt. Parker**:          Okay.

**Off. Arruda**:          …I didn't see her at all.

**Capt. Parker**:          Okay.

**Off. Arruda**:          But he was completely uncooperative…

**Capt. Parker**:          Yup.

**Off. Arruda**:          …from the situation.

**Capt. Parker**:          And I know you can't speak for Rocchio, but at the time that Rocchio kind of grabbed his wrist, it's assumed at that point, Rocchio was taking him in to custody for disorderly?

**Off. Arruda**:          Yes. Yes.

**Capt. Parker**:          And at that point, he wasn't compliant when you took him to the ground? He wasn't following instructions and that sort of thing?

**Off. Arruda**:          He kept screaming, I can't breathe, I can't breathe but nobody was on him obstructing any airways.

**Capt. Parker:**          And at the time that you guys were trying to take him in to custody, you already said, you had his girlfriend videotaping you, you had school

OPS 23-12

Defendants- RFP- 000087

administrators around you and it's assumed that there's some type of other video equipment in the school taping you, correct?

**Off. Arruda**:     Yes, yes.

**Capt. Parker**:     So it's safe to say that you would try to avoid any unnecessary contact or aggressiveness in trying to take him in to custody, knowing that all these people are around watching.

**Off. Arruda**:     Correct.

**Capt. Parker**:     Okay.

**Off. Arruda**:     There's no need to cause that much of a stir with kids in the…

**Capt. Parker**:     Okay. At some point he was secured, I assume? In the lobby area, was he handcuffed?

**Off. Arruda**:     In the vestibule, yes, in between the doors.

**Capt. Parker**:     Okay, all right. And then what happened next?

**Off. Arruda**:     We finally got him in to handcuffs and he was kicking against the wall, screaming, being belligerent and at that time, I told Rocchio, I said let's get him on his butt and lift him up and did gently, there was nothing rough behind it. Then we escorted him out and the escort out is when he was being more belligerent, calling, it was pretty much at this point geared towards Rocchio, calling him a faggot, neanderthal, gay and when Rocchio put him near the cruiser, Mello was kind of like kneeing himself off it, pushing back against Rocchio, so Rocchio placed him down on his butt in the parking lot.

**Capt. Parker**:     Okay. Did he tell you…?

**Off. Arruda**:     It was quick but it was in control.

**Capt. Parker**:     Okay. And then what happened next?

**Off. Arruda**:     We called for a supervisor and along the way, Ms. Ware is her name, she's videotaping the whole thing, Rachel Ware.

**Capt. Parker**:     Okay. So a supervisor arrives, I assume that Mello is basically put in a cruiser and taken to the station to be processed or something like that?

OPS 23-12

Defendants- RFP- 000088

| | |
|---|---|
| **Off. Arruda**: | Well, what happened was, while there was a skirmish in between the two doors, there's a rug, he received an abrasion, which looked like a rug burn, on his forehead. Because of policy, we bring him down, not me, I believe it was Off. Bolduc, she brought him to the hospital, she had him, a rescue come and then he denied treatment. |
| **Capt. Parker**: | Okay. So then what happened next, he was brought to the station at some point? |
| **Off. Arruda**: | Printed and processed, yes. |
| **Capt. Parker**: | All right. So just getting back to, so you were informed and I know you got in to a little that Mr. Mello had some other issues at some other schools that he was dispersed from? |
| **Off. Arruda**: | Yes. |
| **Capt. Parker**: | And you obtained this knowledge how? |
| **Off. Arruda**: | Through his ex-girlfriend. |
| **Capt. Parker**: | Okay. |
| **Off. Arruda**: | Over the phone. |
| **Capt. Parker**: | Over the phone she had mentioned to you that he had had some similar incidents? |
| **Off. Arruda**: | He did this before. |
| **Capt. Parker**: | Okay. And the court order that was handed to you, I know that particular court order may have been expired, but there was still one in effect, is that safe to say? |
| **Off. Arruda**: | I, at that point, I wasn't sure but I was working on faith with that one. I wasn't able to read it because he ripped it out of the Principal's hand and started ripping it up. |
| **Capt. Parker**: | So it's safe to say when a school administrator hands you a court document and says that it's valid and in effect, you know, you're gonna go off of the good faith that that person is telling the truth and that it is in effect, especially you don't have the time to sit down and read it. |

OPS 23-12

Defendants- RFP- 000089

**Off. Arruda**: I would have read it if I had the time.

**Capt. Parker**: Okay. So there was no valid reason for you to believe that that particular order was expired or whatever?

**Off. Arruda**: Correct.

**Capt. Parker**: All right. And then at some point, it was alleged that you may have had a mask on or not had a mask on, can you just explain that?

**Off. Arruda**: Well, back during COVID, I was wearing a gator around my neck, so whatever school I would walk in to, I would read the room, if anybody was wearing masks or they looked afraid that I wasn't wearing a mask, I would just put the gator up, so I had the gator on around my neck, so when I say I had it on, I had it on around my neck. Maybe it wasn't over my nose at that point, but if I walked in there and everybody had theirs on, I would have put it on. It was around my neck, it was on me at that time.

**Capt. Parker**: Okay. And safe to say that because there were so many different mask regulations at this point, can you recall whether or not you were supposed to have it on or not supposed to have it on?

**Off. Arruda**: Yes. We were supposed to have it on. Mr. Mello made it a point, saying that you can't make me put my mask on.

**Capt. Parker**: Okay.

**Off. Arruda**: And at that point, I was trying to team with him to deescalate him, to say I'm with you on this.

**Capt. Parker**: Okay.

**Off. Arruda**: I don't want to wear a mask either.

**Capt. Parker**: Okay. So if something was explained later on regarding the mask, it wasn't something that was important enough that would sit there and make you have a concrete visual as to when you had it on or not?

**Off. Arruda**: Correct.

**Capt. Parker**: Okay. And then it was alleged that, in other court proceedings or what have you, that you perjured yourself in some of your testimony. Can you

OPS 23-12

Defendants- RFP- 000090

get in to that a little bit? The fact that, when I say get in to it a little bit, let me back up, we haven't reviewed any videos or watched anything or gone over any of this before this interview, correct?

**Off. Arruda**:         Correct?

**Capt. Parker**:         So safe to say that when this occurred two years prior, you didn't have the luxury of being able to sit and dissect a video, as far as frame by frame what you did and why you did it and that sort of thing.

**Off. Arruda**:         Correct.

**Capt. Parker**:         Okay and was it the same thing for your court proceedings, you didn't sit there and watch a video for hours on end before…?

**Off. Arruda**:         I did not.

**Capt. Parker**:         Okay, can you just get in to that a little bit, the fact that, you know, obviously if you sit there and watch a video frame by frame and then you take somebody's testimony of something that happened two years earlier, there may be (inaudible)…

**Off. Arruda**:         Discrepancies.

**Capt. Parker**:         …but discrepancies, but they're very minor, considering the big picture?

**Off. Arruda**:         Yes.

**Capt. Parker**:         Safe to say?

**Off. Arruda**:         It didn't have anything to do with the actual reason I was there.

**Capt. Parker**:         Okay. So did any of your testimony regarding the criminal violations or reasoning why you were there, the validity of the court order, was any of that incorrect?

**Off. Arruda**:         No.

**Capt. Parker**:         Okay. And then I guess at some point there was a second incident and an arrest that happened on February 22, 2022, at Western Hills School, but the warrant was drawn by Off. Rocchio for trespassing and obstruction?

**Off. Arruda**:         Yeah, I wasn't involved in that one.

OPS 23-12

**Capt. Parker**: Okay. You had nothing to do with the knives and I know you mentioned that (inaudible)…

**Off. Arruda**: No, Off. Rocchio was the one who saw the knives. And I'm basing it off of recollection from two years prior.

**Capt. Parker**: Okay.

**Off. Arruda**: Mr. Mello seems to believe that I was out to get him because it seems as if, I've seen him on a detail where he's videotaping me and when I saw him, I didn't know it was him, I just saw a cellphone out of the sunroof of a minivan and I was waving and then I noticed it was Mr. Mello. I've got several friends who have access to different social media platforms and Mr. Mello's intent to try to demonize me, saying I lied, I'm arrogant, I'm a prude, all of which is nonsense, because I did attempt to deescalate and have him, of the training that I do have with Lockup, de-escalation is the main portion of it.

**Capt. Parker**: Mm hmm. So…

**Off. Arruda**: That wasn't working with Mr. Mello.

**Capt. Parker**: …so aside from the de-escalation, which we'll get in to in a minute, you said that he had made some type of personal attacks with you on social media and that soft of thing after this whole incident?

**Off. Arruda**: Yes.

**Capt. Parker**: And have you ever had any interaction with him, direct interaction after all this occurred?

**Off. Arruda**: No, just the one time on Reservoir Av. when he was videotaping. I never had any other interactions with Mr. Mello. Though he did have a reporter, I just remembered this, Cranston West, back in May, a female, a reporter from California, made her way in to the school. A kid let her in and she said she's there on behalf of Mr. Mello.

**Capt. Parker**: Okay. So he's disparaged you in different social media platforms?

**Off. Arruda**: Oh, plenty, yes and reaching out to other networks, trying to in his words "bring down the corruption of Cranston", which we again attempted to get him his daughter on that day. It wasn't about his

OPS 23-12

Defendants- RFP- 000092

|                     |                                                                                                                                                                                                      |
|---------------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                     | daughter, it was about control in my eyes that he wanted to control the situation.                                                                                                                    |
| **Capt. Parker**:   | Okay. And for these criminal offenses that happened on this date and we're speaking about, they went to a trial, I believe?                                                                           |
| **Off. Arruda**:    | Yes.                                                                                                                                                                                                  |
| **Capt. Parker**:   | And do you remember what the ultimate outcome was?                                                                                                                                                    |
| **Off. Arruda**:    | I believe they, he was charged with disorderly and possession of the knives. The resisting arrest was dropped because in the judge's eyes, how can you resist arrest when you're handcuffed, but we all know that you can. |
| **Capt. Parker**:   | Yup. Okay, so bottom line is after the trial, he was basically found guilty of…?                                                                                                                      |
| **Off. Arruda**:    | Found guilty of disorderly and possession of the knives.                                                                                                                                             |
| **Capt. Parker**:   | Okay. And I believe that he's currently appealing it to Superior Court. Um, so in other words, the criminal charges are still ongoing from this. Do you have anything else to add?                     |

OPS 23-12

Defendants- RFP- 000093

Exhibit M: (Pages 20-33) Office of Professional Standards OPS Case# 2023-12-IA Officer Rocchio's interview with Captain Parker on September 6, 2023, about Complaints submitted to Cranston Police Department on July 3rd 2023 by Plaintiff Mello and Plaintiff Ware

*Interview of SRO John Roccio*

SRO John Rocchio was interviewed on September 6th, 2023, as part of this investigation. SRO Rocchio stated he recalled this particular arrest, as he was working in his assigned role as a school resource officer when the call for service came in and he responded to the scene. SRO Rocchio was questioned about this complaint and the allegations:

**Capt. Parker**:    We're here today discussing a complaint that was filed regarding alleged unprofessionalism, excessive force, and untruthfulness stemming from an arrest on October 21, 2021, documented in CR #21-58022-AR and in follow-up court proceedings on November 11, 2022. Sir, do you recall the particular event that happened on October 21, 2021, at Western Hills?

**Off. Rocchio:**    Yes.

**Capt. Parker:**    Can you just explain what occurred?

**Off. Rocchio:**    I was contacted by one of the school administrators that there was an issue there. At the time, I believe that I was at headquarters. I wasn't at the school and I began to respond there. But I also spoke with Officer Arruda who, I believe, was closer in proximity to the school than I was, and I asked him to go there. I think that when I spoke with Officer Arruda, he had been contacted by the school as well.

**Capt. Parker**:    So what happened?

**Off. Rocchio**:    When I got there…. This was an irate parent. When I got there, I walked in and there was a man and a woman, later identified as Josh Mello and Rachel Ware. I saw that there was an issue going on and you kinda' judge based on his demeanor that Mr. Mello appeared a little bit upset, irate. So I tried to speak with him. I tried to find out what the problem was 'cause I got there after. You know, they were already kinda' having their conversation, I

OPS 23-12

believe. I tried, you know, talking to Mr. Mello. I asked him his name and he was kinda' confrontational about that. He only wanted to tell me that his name was Josh. One of the things I've learned in going to schools is that to deescalate, if you talk on a first name basis sometimes, it kinda' helps people respond and kinda' calm down. He definitely seemed like he was upset. He really wouldn't explain what, what the issue was at that point. So….

**Capt. Parker:**        So at the time you got there, Officer Arruda was already there dealing with the situation. You came in during that time period?

**Off. Rocchio**:        Yes.

**Capt. Parker:**        Okay. And then what happened next?

**Off. Rocchio:**        So while we were there, they came out and it appeared that Mr. Mello was trying to pick up his daughter. The school had a court document on record that, if my memory serves me correctly, neither biological parent could remove the daughter without prior written consent from the other parent. And there was an issue over that 'cause that's what was in their system. While we were talking with him, he came over….  I guess there was a decision made. I think they spoke with his daughter's biological mother who said that they could allow him to take her. The only concern that we had was because of how he was acting at that time. You know, we didn't feel that comfortable letting him leave with his daughter while he was in that state. So we were trying to get him to calm down, trying to, you know….  And the more we tried to get him to calm down, it seemed like he got more upset and irate.

I know, at one point, he had a cell phone out. He was recording the majority of the conversation I had with him. He had his cell phone and I believed he was recording it. There was a female that was there. We kept on telling him to calm down and he kept on

OPS 23-12

Defendants- RFP- 000095

getting more upset. I warned him multiple times that he could be arrested for Disorderly Conduct. He didn't kinda' take that into consideration. I told him that I could arrest him for it multiple times.

As he got more upset, Officer Arruda came over. We kinda' tried to position ourselves so that he could leave the building if he wanted to. But we were protecting everybody else in that school because of his more aggressive behavior. While that was happening, I noticed that, in one of his pockets, it looked like he had two knife clips, like the belt clips for knives. I wasn't sure if they were actually attached to knives at that point or not, but through my experience, that would be something that was there.

While we were, at one point, speaking with his girlfriend, Rachel, we trying to get him to leave with her, like, "Hey, get him under control." We were trying to get her to help us along too. At one point, I saw him, you know, try to step forward. She had to push him back. At one point, he actually tried to move her out of the way to get towards where I was. With her being where she was, I didn't have the opportunity to take him into custody right there. But I made the decision…. I didn't communicate with Officer Arruda because I just felt that it was gonna' be something when I had that opportunity. I wasn't gonna' tell him I was gonna' arrest him because I just felt that the fight would have been on. The element of surprise was gonna' be a little bit better for me.

**Capt. Parker:**    So, at the time…. Let's back up a little bit.

**Off. Rocchio:**    Okay.

**Capt. Parker:**    So he's being argumentative and is causing a scene within the school?

**Off. Rocchio:**    Yes.

OPS 23-12

Defendants- RFP- 000096

**Capt. Parker:**   And he's yelling in a manner…? Was the school put on lockdown because of this?

**Off. Rocchio:**   I found out later that the school had been put on lockdown. When I got there, I believe they were already on lockdown.

**Capt. Parker:**   Mm, hmm.

**Off. Rocchio:**   I never heard it. I never saw it. And even, at the time, with everything going on, I didn't know whether they announced it while I was there or prior to me being there. So….

**Capt. Parker:**   Okay. So he's being argumentative and is causing a scene. At this point, I assume you have school officials standing around, watching everything?

**Off. Rocchio:**   Yeah. I know there was, at least, the principal, one of the assistant, actually maybe even both of the assistant principals. Again, once I started speaking to him, I kinda' put myself between where he was and the rest of the school.

**Capt. Parker:**   And he was advised several times to calm down and stop causing a scene?

**Off. Rocchio:**   Yes. And again, we even told him multiple times that, "If you calm down, we'll get your daughter. We'll have her come down here. But we're not gonna' have her come down here if this is how you're acting."

**Capt. Parker:**   Right.

**Off. Rocchio:**   Because we're there to protect every child there, including his daughter. Because if he leaves like that, there could be an issue once they left the building.

OPS 23-12

Defendants- RFP- 000097

**Capt. Parker:**    And you said that he had every opportunity to leave? If he chose to go that path, he had a path to the exit way?

**Off. Rocchio:**    Absolutely.

**Capt. Parker:**    Okay. So at the time that you decided that he was going to be placed into custody for Disorderly Conduct, what happened next?

**Off. Rocchio:**    So he, his girlfriend stepped a little bit to the side giving me an opportunity to grab hold of his right arm. I did that. There was a little bit of a struggle. Officer Arruda and I both wound up…  When I got to move back, I believe Officer Arruda grabbed him from the other side. And we couldn't pull him in. I tried to pull him down forward, similar to what we have in training, but because his girlfriend was blocking that way….  And I think she actually may have been grabbing onto him at one point. We couldn't do that. So Officer Arruda actually took him back and he went down and took him to the ground into the vestibule in between the two doors.

**Capt. Parker:**    Mm, hmm.

**Off. Rocchio:**    Um, once he was there, he continued to, you know, kick and try to fight and resist us right there. We were able to get him handcuffed. I think Officer Arruda was on his back. I was able to get him handcuffed and was doing a search on him. While I was doing the search, I actually realized that I had taken the two knives. I kinda' just threw them outta' the way 'cause I wanted them off of his body. And I saw a third knife that was between the waistband of his pants and his skin. So, I was fighting for that and he was kinda' like almost rolling around with it, pushing back at me. I know that when the knives came out of his pocket, Mr. Veasey was there and he went to go grab them.   I think I even

OPS 23-12

Defendants- RFP- 000098

yelled at him to leave them. I grabbed 'em and put 'em in my
pocket.

**Capt. Parker:**          Mm, hmm.

**Off. Rocchio:**          I got the third knife out. You know, at one point, he actually
pushed back. I had to like take him down to another corner
because I was on my knees or I was on one knee, at that point. So,
it was kinda'…. There was a lot of commotion at that point. But I
never delivered a strike. It was pretty much take him down, get
him cuffed, and then once he was searched, get him up and escort
him to the car outside. We don't have cages in our SRO cars so we
had to wait. He was combative and resistant the whole way to the
car, pushing back, you know, being derogatory towards us and
calling us names the whole time.

When we got up to the car, with him pushing back and pushing
back, while I went to lean him forward, around the same time I
went to go lean him forward, he must have given up. So he did go
down on the car a little bit harder than I would have expected
because he had been pushing back against our weight.

**Capt. Parker:**          Mm, hmm.

**Off. Rocchio:**          We were there and because we were waiting, I had my left, my
left leg, I believe, locked around his to keep him from like trying to
kick or anything like that. And he kept on pushing. Now he was
pushing back again. He was still kinda' being, you know…. He was
calling me a Neanderthal, some stuff like that. And he kept on
pushing back. Rather than get injured with him pushing back off
the bar, I took a step back, sat him down. I didn't think that it was
anything too aggressive. But I sat him on the ground because that
kept him from leaving and it kept him from fighting us at that
point. And I believe, a short time later, another officer….it may

OPS 23-12

Defendants- RFP- 000099

have been Officer Bolduc….arrived on scene and we put him into her car and went from there.

**Capt. Parker:**   So, at the time that he was taken into custody in the vestibule and he was secured, is it safe to say that you know there's video there and that you're being observed by multiple school officials, as well as his girlfriend who was videotaping?

**Off. Rocchio:**   Yeah. I knew that, I knew that his girlfriend was videotaping us. I knew that the walkway out in front of the school and the lobby…. I'm not sure about the initial vestibule in between the two doors, if that's recorded. But I know that there are multiple cameras that handle that walkway out to the front. And I know that the main lobby has at least one camera in it.

**Capt. Parker:**   So even when you're walking him out to the car, are you assuming that you're being videotaped?

**Off. Rocchio:**   Yes.

**Capt. Parker:**   And then, at the point that you get him towards the car, you said something about kinda' pushing him up against the cruiser? Or he was pushing back and at that point, he didn't? When he was leaned up against the cruiser, were there any strikes delivered? Did his head hit the cruiser or anything like that?

**Off. Rocchio:**   I don't believe his head struck it. I think it was just his chest that went down on it. I don't remember there being…. I know I didn't strike him. There was no, you know, no need for it. He was handcuffed at that point. It was more just his body pushing back at us and I went to go match it.

**Capt. Parker:**   So he was still resisting at that point?

**Off. Rocchio:**   Yes.

OPS 23-12

Defendants- RFP- 000100

**Capt. Parker:**    And just going back to the knives, you threw them on the ground? And then, at some point, they were secured?

**Off. Rocchio:**    Yes. So, I remember that when I took the first two out of his pocket, I kinda' just threw them away from him because he was still….  He wasn't just lying there being compliant at that point. And I saw the third one when I was doing my search after arresting him. And, you know, when he started moving around, I remember throwing them out there. The principal went to go get them and I know I yelled, "No! Leave them!"  And I think I swept them up and put them in my pocket at that point. And then when I got the third knife, I secured them. So they were on my body.

**Capt. Parker**:    At some point, were they transferred over to Arruda? Or did you take them in from there?

**Off. Rocchio**:    I believe I took them in 'cause they were in my pocket. I can't imagine that I would have had him do it. I think I came here and was with….  I don't know if I took pictures in BCI or if….  I don't know where I did it, but I remember being there when they were photographed.

**Capt. Parker:**    And they were measured and photographed? Okay. And just going back again, have you watched any video or have you seen any pictures of anything before this interview?

**Off. Rocchio:**    Ah, no.

**Capt. Parker:**    So, is it safe to say that when you're going off your recollection of events now….?  Now this occurred two years ago. So as far as what happened when, without watching a video or seeing any other photographs to jog your memory, you're going off….?

**Off. Rocchio**:    Just my recollection of it.

OPS 23-12

Defendants- RFP- 000101

**Capt. Parker:**          Considering that it happened two years ago... So, at some point, you said that he was taken in by Officer Bolduc?

**Off. Rocchio:**          I believe that's who transported him in.

**Capt. Parker**:          And then he alleged some type of injury? He was alleging a rug burn on his head, something to that effect?

**Off. Rocchio**:          Yeah. I remember that when we did take him out, there was a mark on his forehead. But I believe that was from the rug or the mat inside that vestibule.

**Capt. Parker**:          Now you've said that you've had some special de-escalation training and that you did attempt to use some of that during this incident. Can you just get into that a little bit?

**Off. Rocchio**:          Yeah. So I've been to both Elite's De-escalation Classes and I've been there as an instructor. I actually instruct the Police Department, as well as Patrol. Again, a lot of times, you try to trade commonalities with the person. You try to get it to a personal level. Try to listen to what they're saying so that they can... You know, a lotta' times, people just get frustrated and they want to get their part out. So if you let them get their side out, there's a bunch of different tactics. I tried some of those. "Hey, what's your name?" (I was) trying to get to a personal level with him. Like I said, he didn't wanna' tell me what was going on. He didn't wanna', you know…. He gave me his name, but everything was abrupt. He wasn't interested in talking. He was more argumentative and frustrated, I guess you could say at that point.

**Capt. Parker:**          So there were de-escalation tools that were used? They weren't effective?

OPS 23-12

Defendants- RFP- 000102

**Off. Rocchio:**     Yes, yeah.

**Capt. Parker:**     In your mind, was any excessive force used during the initial taking him into custody and when walking him out to the car?

**Off. Rocchio**:     I don't believe so. No.

**Capt. Parker**:     So the force that was used was justified based on his behavior?

**Off. Rocchio:**     It was based on his behavior…absolutely.

**Capt. Parker:**     Now there were some allegations about the court order being expired. Did you have anything to do with that? Or is that mostly Arruda?

**Off. Rocchio**:     So the court order…. The only thing I found out is that the court order, I guess, was carried over from another school and the school district's policy is that until they have something that changes that, that's the order that they go by.

**Capt. Parker:**     So it's safe to say that when a school official comes to you with some type of court order and says that it's in effect, on good faith you're going to go off what they're telling you?

**Off. Rocchio:**     Absolutely.

**Capt. Parker**:     Okay. And then there were also some allegations that, at some point, Mr. Mello or Ms. Ware, maybe in combination, reported some type of video of a couple of kids from the school and some type of sexual joke. And they're alleging that there was no investigation done into this video? Can you just get into that a little bit?

**Off. Rocchio:**     It was brought to my attention by, I believe, a School Committee member who sent it to me. I reviewed it. I believed that the video

OPS 23-12

Defendants- RFP- 000103

was taken inside the school. I went to one of the administrators there and provided them with the video. They were able to determine that it was taken, that the video was taken in the school and that there were students there. Because it didn't reach a criminal level, that was the end of my association with it. But I do believe that they investigated it and that they took action as they needed to do per their school policies.

**Capt. Parker**:     So there was an investigation into the matter? It was mostly done by the school? And since it occurred on school grounds, there was nothing criminal that took place according to what you saw?

**Off. Rocchio:**     Yes.

**Capt. Parker**:     And there were also some perjury allegations regarding some of the court testimony. So can you comment about that? Basically, let me go back, what you testified to in court regarding the substantive issues, the criminal issues, the taking him into custody, that sort of thing, were there any discrepancies in any of that?

**Off. Rocchio:**     None at all.

**Capt. Parker:**     Is it safe to say that when you testified to something that occurred a year or two prior, there may be minor discrepancies that come up?

**Off. Rocchio:**     Possibly.  Perspective....and not having cameras to go by or anything to that effect.

**Capt. Parker:**     Okay. And you guys weren't wearing body cameras when this incident happened. Correct?

**Off. Rocchio:**     No. We did not have them.

OPS 23-12

Defendants- RFP- 000104

**Capt. Parker:**      Have you had any other interactions with Mr. Mello or Ms. Ware after this took place?

**Off. Rocchio:**      I have not. I know that there have been other ones, but at the time they were there…. He was issued a No Trespass for one of the schools. I took a couple of reports that he had been in the school and I've seen video footage of him being there.

**Capt. Parker:**      Mm, hmm.

**Off. Rocchio:**      And we charged him with that. But I've never personally interacted with him during them. I know there was that and then we had to go to court for the Trespassing complaints and then, obviously, for the trial regarding this arrest.

**Capt. Parker:**      Okay. But you haven't had any social interactions with him? Or seen him on the road? Has he made any derogatory comments towards you in person or anything like that?

**Off. Rocchio:**      There was one case. Again, it wasn't something where I interacted with him. There was one case where it was reported that he had driven by a school where there was a driveway….George J. Peters School. And, at the time, they didn't realize it was him. It was after that they showed me the video. It appears to be him and it appears to be his girlfriend's car. He like drove by the front of George J. Peters School during the day and recorded it. So they reported it to me as being kinda' suspicious. The principal at the time didn't know who he was. Again, it was documented and there was nothing that was done criminally. So it wasn't taken any further.

**Capt. Parker:**      Okay. Was there anything unprofessional done by you or anything unprofessional you observed by Officer Arruda?

**Off. Rocchio:**      No.

OPS 23-12

Defendants- RFP- 000105

**Capt. Parker:**     Can you get into the measuring of the knives? I believe there was some discrepancy….

**Off. Rocchio:**     Again, not having the statute right in front of me, I believe that our State statute is from the tip of the knife, the point of the knife until where the blade touches the handle….  My interpretation of it is from the deepest point of that blade to the point of that blade…  Because sometimes the actual sharper blade is shorter than the actual blade that extends past where the knife is. That's how I've always done it and it's never come into question.

The other thing that I realized after going through this is that one of the knives that he had was a flip-open like box cutter but with a razor knife. And after reviewing that Weapons Other Than Firearms, that actually would have qualified for a second charge as well regardless of the size of it. So…  That was a little bit different when it was brought to our attention that it was done that way. But I believe it was too late to add that as a charge.

**Capt. Parker:**     So they were measured and, in your view, they conflicted with the statute and that's why he was charged?

**Off. Rocchio:**     Yes. They were longer than three inches.

**Capt. Parker:**     And then, at some point, do you recall what happened in the criminal charges that he was charged with? I believe there was a trial and he was convicted on certain charges?

**Off. Rocchio:**     He was, he was….  We charged him with Disorderly Conduct and Resisting Arrest and then Weapons Other Than Firearms which was the three-inch knife. He was found guilty on the Disorderly and he was found guilty on the knife. The trial judge didn't believe that somebody could resist arrest after they were in handcuffs

OPS 23-12

Defendants- RFP- 000106

and because I hadn't told him that he was under arrest before grabbing him, he couldn't resist arrest at that point.

**Capt. Parker**:          Okay. And the reason why you hadn't told him that he was under arrest was because you felt that it would inflame the situation before he was actually in custody?

**Off. Rocchio**:          Yes. And I had mentioned multiple times, "Hey, if you don't calm down, I can charge you with Disorderly Conduct." I said that throughout that, "I can charge you with this right now."

**Capt. Parker**:          Alright.

**Off. Rocchio**:          I was trying to…. Sometimes, by putting that in some peoples' heads, it's enough to let them realize that, "Hey, maybe I need to change my behavior." But he didn't do that. So….


*Statements of Witnesses on Scene*

As part of this investigation, this office reviewed the written statements of the school officials on the scene who witnessed this encounter. These written statements are included as part of this investigation. All of the statements basically give the same account – that Mello was "very belligerent and argumentative," raising his voice and swearing to the point the school was placed on lockdown. Officers attempted to calm Mello down but could not, and the officers had to place Mello under arrest.

OPS 23-12

Defendants- RFP- 000107

# Exhibit N: 3rd Division District Court, Case Summary, Case No. 31-2021-08448

3rd Division District Court

## Case Summary

### Case No. 31-2021-08448

| | | |
|---|---|---|
| **State of Rhode Island v. JOSHUA MELLO** | § § | Location: **3rd Division District Court** |
| | | Filed on: **10/22/2021** |

---

### Case Information

| Offense | Statute | Degree | Offense Date | Filed Date | |
|---|---|---|---|---|---|
| | | | | | Case Type: Misdemeanor |
| | | | | | Case Status: **11/30/2022 Closed** |

Jurisdiction: **Cranston Police Department**

| | Offense | Statute | Degree | Offense Date | Filed Date |
|---|---|---|---|---|---|
| 1. | Disorderly Conduct Arrest | 11-45-1(a) | M | 10/21/2021 | 10/22/2021 |
| 2. | Resisting Legal or Illegal Arrest | 12-7-10 | M | 10/21/2021 | 10/22/2021 |
| 3. | Weapons Other Than Firearms Prohibited | 11-47-42(a) | M | 10/21/2021 | 10/22/2021 |

### Related Cases
3CA-2023-07481 (Consolidated Case)
P3-2022-4224A (Related Case Number)

### Statistical Closures
11/30/2022   Bench Trial Disposition

---

### Party Information

| | | |
|---|---|---|
| **Plaintiff** | **State of Rhode Island** | |
| **Defendant** | **MELLO, JOSHUA** DOB: 03/18/1975 SID: 10111985 | Pro Se **Lisi, Justin James** *Retained* **DELANEY, WILLIAM J.** *Court Appointed* **HURVICH, CARL H.** *Retained* **Hornstein, James Thomas Jr.** *Retained* **MANFRED, LEO F.** *Court Appointed* |
| **Agency** | **CRANSTON POLICE DEPARTMENT** SID: @11813615 | |
| **Bond Payor** | **Ware, Rachel** | |

---

### Dispositions

11/30/2022   **Disposition** (Judicial Officer: McCaffrey, Mary E.)
  1. Disorderly Conduct
    Guilty Finding
  2. Resisting Legal or Illegal Arrest
    Not Guilty Finding
  3. Weapons Other Than Firearms Prohibited
    Guilty Finding

3rd Division District Court

**Case Summary**

**Case No. 31-2021-08448**

11/30/2022   **Sentence** (Judicial Officer: McCaffrey, Mary E.)
     1. Disorderly Conduct
        Judgment
        Criminal Sentence
          Effective Date: 11/30/2022
          Suspended: 6 Months
          Probation: 6 Months
        Condition - Adult:
        1.  Court Costs, 11/30/2022, Active 11/30/2022

11/30/2022   **Sentence** (Judicial Officer: McCaffrey, Mary E.)
     3. Weapons Other Than Firearms Prohibited
        Judgment
        Criminal Sentence
          Effective Date: 11/30/2022
          Suspended: 1 Year
          Probation: 1 Year
        Condition - Adult:
        1.  Court Costs, 11/30/2022, Active 11/30/2022

---

## Case Events

| | |
|---|---|
| 10/22/2021 | Criminal Case Information Update, JLINK to Police Department |
| 10/22/2021 | Criminal Complaint Filed |
| 10/22/2021 | Notice of Court Date |
| 11/16/2021 | Criminal Case Information Update, JLINK to Police Department |
| 11/16/2021 | Not Guilty Plea Entered |
| 11/16/2021 | Waiver of Jury Trial |
| 11/16/2021 | Referred to the Public Defender |
| 11/16/2021 | Notice of Court Date |
| 12/14/2021 | Criminal Case Information Update, JLINK to Police Department |
| 01/24/2022 | Criminal Case Information Update, JLINK to Police Department |
| 01/24/2022 | Notice of Court Date |
| 02/07/2022 | Criminal Case Information Update, JLINK to Police Department |
| 02/22/2022 | Criminal Case Information Update, JLINK to Police Department |
| 02/22/2022 | 46G Violation Filed |
| 02/22/2022 | Mittimus Issued |
| 02/22/2022 | Bond Posted |
| 02/22/2022 | Bail and Recognizance Conditions |
| 03/01/2022 | Criminal Case Information Update, JLINK to Police Department |
| 03/01/2022 | Entry of Appearance |
| 03/02/2022 | Criminal Case Information Update, JLINK to Police Department |
| 03/08/2022 | Notice of Court Date |
| 03/08/2022 | Public Defender Conflict Letter Filed |
| 03/09/2022 | Criminal Case Information Update, JLINK to Police Department |
| 03/10/2022 | Court Appointed Attorney Accepted |
| 03/15/2022 | Criminal Case Information Update, JLINK to Police Department |
| 03/21/2022 | Criminal Case Information Update, JLINK to Police Department |

     Printed on 04/28/2025 at 12:54 PM

3rd Division District Court

## Case Summary

### Case No. 31-2021-08448

| | |
|---|---|
| 03/21/2022 | Entry of Appearance |
| 03/21/2022 | Notice of Court Date |
| 04/04/2022 | Criminal Case Information Update, JLINK to Police Department |
| 04/04/2022 | Notice of Court Date |
| 04/11/2022 | Criminal Case Information Update, JLINK to Police Department |
| 04/11/2022 | Notice of Court Date |
| 04/14/2022 | Entry of Appearance |
| 04/22/2022 | Criminal Case Information Update, JLINK to Police Department |
| 05/02/2022 | Criminal Case Information Update, JLINK to Police Department |
| 05/02/2022 | Entry of Appearance |
| 05/16/2022 | Notice of Court Date |
| 05/18/2022 | Criminal Case Information Update, JLINK to Police Department |
| 05/23/2022 | Criminal Case Information Update, JLINK to Police Department |
| 06/13/2022 | Criminal Case Information Update, JLINK to Police Department |
| 06/29/2022 | Motion |
| 06/30/2022 | Notice of Court Date |
| 07/01/2022 | Criminal Case Information Update, JLINK to Police Department |
| 07/11/2022 | Criminal Case Information Update, JLINK to Police Department |
| 07/11/2022 | Entry of Appearance |
| 07/27/2022 | Criminal Case Information Update, JLINK to Police Department |
| 09/21/2022 | Criminal Case Information Update, JLINK to Police Department |
| 09/21/2022 | Notice of Court Date |
| 11/02/2022 | Criminal Case Information Update, JLINK to Police Department |
| 11/02/2022 | Notice of Court Date |
| 11/15/2022 | Notice of Court Date |
| 11/16/2022 | Criminal Case Information Update, JLINK to Police Department |
| 11/17/2022 | Criminal Case Information Update, JLINK to Police Department |
| 11/17/2022 | Motion to Withdraw |
| 11/18/2022 | Criminal Case Information Update, JLINK to Police Department |
| 11/30/2022 | Motion Granted |
| 11/30/2022 | Appealed to Superior Court |
| 11/30/2022 | Bail and Recognizance Conditions |
| 12/07/2022 | Bail Transferred |
| 01/09/2023 | Requested Recording Completed |
| 07/21/2023 | Motion |
| 09/21/2023 | Motion |
| 10/05/2023 | Notice Sent |
| 10/05/2023 | Notice Sent |
| 10/05/2023 | Notice Sent |
| 10/12/2023 | Miscellaneous Document Filed |
| 11/27/2023 | Criminal Case Information Update, JLINK to Police Department |
| 12/11/2023 | Public Defender Conflict Letter Filed |

Printed on 04/28/2025 at 12:54 PM

3rd Division District Court

## Case Summary

### Case No. 31-2021-08448

| | |
|---|---|
| 12/11/2023 | Order Entered |
| 12/18/2023 | Notice of Court Date |
| 12/26/2023 | Criminal Case Information Update, JLINK to Police Department |
| 12/26/2023 | Court Appointed Attorney Accepted |
| 12/29/2023 | Criminal Case Information Update, JLINK to Police Department |
| 12/29/2023 | Miscellaneous Document Filed |
| 01/08/2024 | Criminal Case Information Update, JLINK to Police Department |
| 01/08/2024 | Notice of Court Date |
| 01/29/2024 | Criminal Case Information Update, JLINK to Police Department |
| 01/29/2024 | Miscellaneous Document Filed |
| 01/29/2024 | Entry of Appearance |

---

## Hearings

11/16/2021   **Arraignment**   (9:00 AM)   (Judicial Officer: Jabour, Christine S.)
*Hearing Concluded*

12/13/2021   **Pretrial Conference**   (9:00 AM)   (Judicial Officer: Capraro, Anthony)
*Hearing Continued*

01/24/2022   **Pretrial Conference**   (9:00 AM)   (Judicial Officer: Capraro, Anthony)
*Hearing Continued*

02/07/2022   **Pretrial Conference**   (9:00 AM)   (Judicial Officer: Capraro, Anthony)
*Hearing Concluded*

02/22/2022   **Presented as a Violator**   (9:00 AM)   (Judicial Officer: Trezvant, William J.)
*Hearing Concluded*

03/01/2022   **Status Conference**   (9:00 AM)   (Judicial Officer: Caruolo, James J.)
*Hearing Continued*

03/08/2022   **Status Conference**   (9:00 AM)   (Judicial Officer: Bucci, Elaine T.)
*Hearing Continued*

03/15/2022   **Status Conference**   (9:00 AM)   (Judicial Officer: Bucci, Elaine T.)
*Hearing Continued*

03/21/2022   **Status Conference**   (9:00 AM)   (Judicial Officer: Caruolo, James J.)
*Hearing Continued*

04/04/2022   **Status Conference**   (9:00 AM)   (Judicial Officer: Bucci, Elaine T.)
*Hearing Continued*

04/11/2022   **Status Conference**   (9:00 AM)   (Judicial Officer: Caruolo, James J.)
*Hearing Continued*

04/25/2022   *CANCELED* **Trial**   (9:00 AM)   (Judicial Officer: Capraro, Anthony)
*Presented as a Violator*

05/02/2022   **Status Conference**   (9:00 AM)   (Judicial Officer: Bucci, Elaine T.)
*Hearing Continued*

05/16/2022   **Status Conference**   (9:00 AM)   (Judicial Officer: Bucci, Elaine T.)
*Hearing Continued*

05/23/2022   **Status Conference**   (9:00 AM)   (Judicial Officer: Bucci, Elaine T.)
*Hearing Concluded*

06/13/2022   **Bail Violation Hearing**   (9:00 AM)   (Judicial Officer: Bucci, Elaine T.)
*Hearing Continued*

06/30/2022   **Bail Violation Hearing**   (9:00 AM)   (Judicial Officer: Bucci, Elaine T.)

**Case Summary**

**Case No. 31-2021-08448**

*Admits to Violation*

07/11/2022   **Pretrial Conference**   (9:00 AM)   (Judicial Officer: Caruolo, James J.)
*Hearing Concluded*

07/27/2022   **Trial**   (9:00 AM)   (Judicial Officer: Capraro, Anthony)
*Hearing Continued*

09/21/2022   **Trial**   (9:00 AM)   (Judicial Officer: Goldman, Brian A.)
*Hearing Continued*

11/02/2022   **Trial**   (9:00 AM)   (Judicial Officer: McCaffrey, Mary E.)
*Hearing Continued*

11/15/2022   **Trial**   (9:00 AM)   (Judicial Officer: McCaffrey, Mary E.)
*Hearing Continued*

11/30/2022   **Trial**   (9:00 AM)   (Judicial Officer: McCaffrey, Mary E.)
*Hearing Concluded*

11/30/2022   **Hearing on Motion to Withdraw**   (9:00 AM)   (Judicial Officer: McCaffrey, Mary E.)
11/28/2022 Reset by Court to 11/30/2022
*Hearing Concluded*

10/18/2023   **Review**   (9:00 AM)
*Hearing Passed*

12/11/2023   **Status Conference**   (9:00 AM)   (Judicial Officer: McCaffrey, Mary E.)
*Hearing Concluded*

12/18/2023   **Post-conviction Relief**   (9:00 AM)   (Judicial Officer: Caruolo, James J.)
*Hearing Continued*

01/08/2024   **Miscellaneous Hearing**   (9:00 AM)   (Judicial Officer: Goulart, Alan R.)
*Hearing Continued*

01/29/2024   **Post-conviction Relief**   (9:00 AM)   (Judicial Officer: McCaffrey, Mary E.)
*Hearing Continued*

---

## Bond Settings

---

02/22/2022   **Bond Setting**
Surety $1,000.00 (@10% $100.00) Any

# Exhibit R: Cranston Police Department's Use-of-Force policy



# Cranston Police Department

# General Order 310.01

| SECTION | EFFECTIVE DATE | PAGES |
|---|---|---|
| 300 – Law Enforcement Operations | April 5, 2021 | 9 |

| SUBSECTION | SPECIAL INSTRUCTIONS |
|---|---|
| 10 – Use of Force | |

| TITLE | CALEA STANDARD |
|---|---|
| 310.01 – Use of Force | |

## I. Purpose

The purpose of this policy is to provide police officers with guidelines on the use of force.

## II. Policy

It is the policy of the Cranston Police Department to recognize and respect the value and special integrity of each human life. In vesting police officers with the lawful authority to use force to protect the public welfare, a careful balancing of all human interests is required.

Therefore, it is the policy of this department that police officers will use only that force that is objectively reasonable to accomplish lawful objectives.

## III. Authority

a. Rhode Island General Law

b. The Chief of Police is vested by and subject to the provisions of the City Charter and the laws of the State of Rhode Island, with the authority to approve, issue, modify, or rescind all departmental general orders, special orders, personnel orders, and memoranda.

## IV. Definitions

*Administrative Review*: A documented review of an incident or occurrence prepared by or for the Colonel/Chief of Police or his/her designee. The review should indicate whether policy, training, equipment, or disciplinary issues should be addressed.

*Analysis*: A systematic, structured process for dissecting an event into its basic parts to identify any patterns or trends. Analysis should reveal patterns or trends that could be predictive or could indicate program effectiveness, training needs, equipment upgrade needs and/ or policy modification needs.

Defendants- RFP- 000240

*Appropriate Medical Aid*: Appropriate medical aid may include increased observation to detect obvious changes in condition, flushing chemical agents from the eyes, applying first aid, evaluation by rescue personnel, or for more serious or life-threatening incidents, immediate aid by medical professionals.

*Choke Hold*: A physical maneuver applied to the neck that restricts an individual's ability to breathe for the purpose of rendering the individual unconscious.

*De-Escalation*: Taking action and/or communicating verbally or non-verbally during a potential force encounter in an attempt to stabilize the situation and reduce the immediacy of the threat so that more time, options, and/or resources can be called upon to resolve the situation without the use of force or with a reduction of the force necessary. De-escalation may include the use of such techniques as command presence, advisements, warnings, verbal persuasion, and/or tactical repositioning.

*Imminent Threat*: Such an appearance of an impending threat as would cause a reasonable police officer to immediately act to stop the threat

*Objectively Reasonable Force:* Objectively reasonable force is that force which is necessary and appropriate when analyzed from the perspective of a reasonable officer possessing the same information and faced with the same circumstances as the officer who has actually used force. Objectively reasonable force is not judged with hindsight, and will take into account, where appropriate, the fact that officers must make rapid decisions regarding the level of force to use in tense, uncertain, and rapidly evolving situations. Important factors to be considered when deciding how much force can be used to apprehend or subdue a subject include, but are not limited to:

A.  The severity of the crime at issue;

B.  Whether the subject poses an imminent threat to the safety of the officers or others;

    *and*

C.  Whether the subject is actively resisting arrest or attempting to evade arrest by flight.

*Reasonable Belief*: Those facts and circumstances that would lead a normally prudent police officer to believe that his/her actions are necessary.

*Serious Bodily Injury*: Physical injury that (1) creates a substantial risk of death; (2) causes protracted loss or impairment of the function of any bodily part, member, or organ; or (3) causes serious permanent disfigurement.

*Vascular Neck Restraint:* A technique that can be used to incapacitate individuals by restricting the flow of blood to their brain.


**V.    Procedures**

    A.  GENERAL REQUIREMENTS

        1.  De-Escalation
           a.   When safe and appropriate under the totality of the circumstances

                i.  officers will assess the situation to determine if de-escalation is appropriate in order to reduce the potential need for force;

                ii.  officers shall use de-escalation techniques and other alternatives to higher levels of force consistent with his or her training and experience.

           b.   Whenever possible, and when such delay will not compromise the safety of the officer or another and will not result in the destruction of evidence, escape of a suspect, or

commission of a crime, an officer shall allow an individual time and opportunity to submit to verbal commands before force is used.

2. Duty to Intervene – All officers present and observing another officer using force that is c l e a r l y beyond that which is objectively reasonable under the circumstances, shall intercede to prevent the use of such force when in a position to do so safely. Officers shall report these observations to a non-involved supervisor without unnecessary delay.

3. Appropriate medical aid consistent with police officer training will be provided as soon as is practical in all lethal force and less lethal force option usage resulting in injury, or allegation of injury, to include injuries incurred during apprehension and /or custody.

4. Use of physical force shall be discontinued when resistance ceases or when the incident is under control.

5. Physical force shall not be used against individuals in restraints, except as objectively reasonable to prevent their escape or prevent imminent bodily injury to the individual, the officer, or another person.

6. A department authorized and certified weapons instructor or armorer shall perform and document an inspection of all weapons:

    a) Prior to issuance to an individual officer or made available for shared department use; and

    b) At the time of qualification or recertification of said weapon.

7. Prior to their initial assignment, and at least annually thereafter, the department shall ensure that each officer receives training on the department's use of force policies, and document receipt of same.

    a) All definitions contained in this policy will be included in said training.
    b) All officers shall receive and sign for the receipt of the department's Use of Force Policy and any revisions thereto in hard copy or digital format.

B. PARAMETERS FOR USE OF LETHAL FORCE

1. A police officer is authorized to use lethal force in order to:

    a) Protect him/herself, another officer, or other person(s) when the officer has an objectively reasonable belief that an imminent threat of death or serious bodily injury exists to himself/herself, another officer or other person(s).

    b) To prevent the escape of a fleeing subject when the officer has probable cause to believe that the person has committed, or intends to commit, a felony involving serious bodily injury or death, and the officer reasonably believes that there is an imminent risk of serious bodily injury or death to the officer or another if the subject is not immediately apprehended.

2. When feasible, police officers will identify themselves as a police officer and state their intent to use lethal force.

3. Lethal Force Restrictions: Lethal force should not be used against persons whose actions are clearly a threat only to themselves or property.

4. Police officers will adhere to the following restrictions:

Defendants- RFP- 000242

a) Except for maintenance or during training, police officers will not draw or exhibit their firearm unless circumstances create reasonable cause to believe that it may be necessary to use the firearm in conformance with this policy.

b) Warning shots are prohibited.

5. Discharging a firearm **from** a moving vehicle shall be avoided. However, whenever a situation exists where an officer must consider discharging a firearm from a moving vehicle in order to stop an imminent threat of death or serious bodily injury to himself/herself or others, the use of lethal force by the officer must not constitute a greater hazard to the public than does the imminent threat, and must be the most reasonable course of action under the circumstances. Officers must weigh the need to use lethal force against the potential harm to innocent bystanders caused by such use.

6. Discharging a firearm **at** a moving vehicle shall be avoided unless a person in the vehicle poses an imminent threat of death or serious bodily injury to the officer or another person. Officers shall avoid intentionally placing themselves in a position where a vehicle may be used against them. Escape from the path of an oncoming vehicle should be considered prior to, or in lieu of, the implementation of lethal force whenever escape is possible. However, whenever a situation exists where an officer must consider discharging a firearm at a moving vehicle in order to stop an imminent threat of death or serious bodily injury to himself/herself or others, the use of lethal force by the officer must not constitute a greater hazard to the public than does the imminent threat, and must be the most reasonable course of action under the circumstances. Officers must weigh the need to use lethal force against the potential harm to innocent bystanders caused by such use.

7. In both Sections 5 and 6 above, the officer's focus will be to stop that person presenting the imminent threat, and not to disable the vehicle of which the suspect is an occupant. (This provision will not preclude tactical responses in a tactical operation.)

8. A police officer may discharge a firearm to euthanize an animal that represents a threat to public safety, or as a humanitarian measure where the animal is seriously injured.

C. PARAMETERS FOR USE OF LESS LETHAL FORCE

1. Less Lethal Force Options:

a) The level of force used by an officer is directly related to the facts and circumstances encountered by that officer. Force options currently available to officers include, but are not limited to:

(1) *Command Presence* - An officer's appearance may be enough to dissuade some persons from engaging in resistive behavior.

(2) *Verbal Commands* - Dialogue used by an officer can serve to diffuse potentially violent situations.

(3) *Physical Skills* - Physical techniques used by an officer to control potentially violent situations.

(4) *Chemical Spray* - Used in compliance with General Order 310.20 entitled "Use of Oleoresin-Capsicum Spray".

(5) *Impact Tools* - Striking tools used in compliance with General Order 310.40 entitled "Use of Police Baton".

(6) *Conducted Electrical Weapon (CEW)* - Used in compliance with General Order 310.06 entitled "Use of Conducted Electrical Weapon (CEW)."

(7) *K9* - Used in compliance with General Order 320.60 "Canine Unit".

2. Police officers are authorized to use department-approved less lethal force options to accomplish lawful objectives, as follows

   a) To protect themselves or another from physical harm.

   b) To restrain or subdue a resistant individual.

   c) To bring an unlawful situation safely and effectively under control.

   d) To maintain control of a person or situation.

3. It is not the intent of this policy to direct officers to try each of the force options before moving to another. Officers may employ that force option which they believe is objectively reasonable to accomplish lawful objectives

4. Choke holds and vascular neck restraints are prohibited unless lethal force is authorized.

5. It is understood that when requesting mutual aid assistance, the available force options of the responding agency may differ from those of the requesting agency. Officers shall be subject to the policies and procedures of their employing agencies at all times.

6. Authorized less lethal options are those with which the police officer has received department approved training on proper and safe usage.

7. Nothing contained in this section limits an officer's ability to use those means objectively reasonable for self-defense or to accomplish lawful objective, including but not limited to items of opportunity.

D. TRAINING AND QUALIFICATIONS REGARDING LETHAL FORCE – FIREARMS

1. While on duty, police officers will carry and use only firearms and ammunition authorized by and documented with the Training Division

2. At least annually and in accordance with Rhode Island General Laws, the department shall conduct training and qualifications for all department authorized duty firearms to include specialized firearms.

3. Authorized firearms are those with which the police officer has qualified and received departmental training on proper and safe usage, and that are documented and comply with departmental specifications.

4. The department shall have a separate policy addressing the authorization of duty, off-duty and specialized firearms, weapons, and ammunition.

5. Unsafe or defective department-issued firearms shall be replaced or repaired.

6. All recent hires of the department shall be qualified by the hiring agency's certified firearms instructor using that agency's POST certified qualification course. This qualification shall take place prior to the officer carrying their department authorized duty firearms in any official capacity.

7. Police officers who are unable to qualify with their duty firearm(s), in accordance with department testing procedures will be given remedial training by the department's authorized certified firearms instructor.

   a) Upon successful completion of this training, the officer will be retested.

Defendants- RFP- 000244

b) If after a second attempt the officer does not qualify, a report will be forwarded to the Colonel/Chief of Police by the department's authorized and certified firearms instructor.

c) The Colonel/Chief of Police will then take such action as he/she deems necessary and n o t inconsistent with this policy.

8. A police officer will not be authorized to carry or use any duty firearm which he/she has not been able to qualify with during the department's most recent qualification period.

9. A police officer that has suffered an illness, injury or absence that could affect his/her ability to use a department authorized firearm will be required to requalify before returning to enforcement duties.

10. Officers who carry personally owned firearms and ammunition **off-duty** must have said firearms and ammunition authorized by the department and, at least annually, demonstrate proficiency and safe handling techniques to the department's certified firearm instructor.

E.  TRAINING AND QUALIFICATIONS REGARDING LESS LETHAL FORCE

1. Annually each sworn officer is required to demonstrate proficiency with department approved less lethal force options which he/she is authorized to use. Proficiency standards are established as follows:

a) Attainment of minimum qualification requirements in accordance with performance standards as determined by current training doctrine, methods, and/or trends;

b) Proper demonstration of recognized physical skills; and

c) Demonstrated knowledge of department policies pertaining to the use of less lethal force options.

2. The program of instruction will be conducted by a qualified instructor who has achieved and maintained certification in the respective less lethal force option(s).

3. The Training Division will maintain training documentation to include lesson plans, attendance sheets, and proficiency records

4. Proficiency standards shall be satisfied prior to an officer being authorized to carry and/or utilize the less lethal force option(s).

5. Police officers who are unable to show proficiency with a less lethal force option in accordance with department testing procedures will be given remedial training by the department's less lethal force training instructor staff.

a) Upon successful completion of this training, the officer will be retested.

b) If after a second attempt the officer does not evidence proficiency, a report will be forwarded to the Colonel/Chief of Police by the department's lead less lethal force training instructor.

c) The Colonel/Chief of Police will then take such action as he/she deems necessary and not inconsistent with this policy.

F.  REPORTING USES OF FORCE

1. A reportable use of force is defined as any incident in which a sworn department member exercises his/her police powers and uses a force option *except* for those actions set forth in Subsection 3 below.

2.  A Non-Compliance Report shall be submitted when an officer:

Defendants- RFP- 000245

a. Discharges a firearm outside of the firing range, but not including the dispatching of a critically wounded or dangerous animal.

b. Takes action that results in or is alleged to result in, injury or death to another person(s).

c. Applies weaponless physical force to suspect(s) whether or not injury occurs.

d. Apply force through the use of less-lethal weapons to include, but not limited to oleoresin capsicum, impact tools, CEW and K-9 bites to a subject.

e. Points a firearm at a person(s).

f. Is involved in an off-duty arrest. (Refer to General Order 310.02)

3. Exceptions to reportable force:

   a) Command presence.

   b) Verbal commands.

   c) Compliance handcuffing which does not result in injury, the appearance of injury, or the complaint of pain.

4. Officers will notify a supervisor who is *not* involved in the incident without unnecessary delay and in accordance with department policy whenever a reportable use of force incident occurs either on-duty or off-duty.

5. A supervisor shall respond to the scene of an incident whenever the use of force results in physical injury or death, or when the officer either accidentally or intentionally discharges a firearm in other than training capacities and animal euthanasia. The supervisor shall survey the area where the use of force occurred to identify the presence of any video surveillance equipment (to include personally owned cellular telephones that may have recorded the incident) and to collect and preserve all video footage with the permission of the owner. In addition, the supervisor will ensure that photographs of the scene and any subject or officer injury are taken then attached to the report**.**

6. When any use of force incident occurs inside of, or within the curtilage of headquarters, or any department facility equipped with surveillance cameras, the OIC shall review all in-house video and, regardless of whether the use of force incident was captured, ensure that the video is secured, via a written request to the IT Unit Commander, and submitted as evidence in the applicable offense/arrest report.

7. An officer who has used force shall articulate in writing the force used and the facts, circumstances, and reasons for the use of said force.

8. The non-involved immediate supervisor will conduct a documented initial review of the use of force and sign the non-compliance form. The original form will be forwarded through the appropriate chain of command for administrative review. The supervisor conducting the initial review shall also forward a copy of the non-compliance form to the Training Division.

9. All reportable uses of force resulting in death, serious bodily injury, or allegations of serious bodily injury shall be investigated by **trained personnel**.

10. In lieu of a non-compliance form, an officer shall be required to prepare a written report in accordance with departmental procedures whenever any of the following actions have occurred:

    a) The officer discharges a firearm under circumstances that are not otherwise classified as a reportable use of force, except for those times when said discharge

occurs either during a weapons training or during lawful recreational activities where no report is necessary.

b) The officer discharges a firearm to euthanize an animal, as set forth in Section IV (B) (8).

G. <u>DEPARTMENTAL RESPONSE</u>

1. The Chief of Police or his designee will conduct an administrative documented review of non-compliance forms and indicate whether policy, training, equipment or disciplinary issues should be addressed.

2. All non-compliance forms will be reviewed and documented in the performance tracking system (General Order 230.30) by the officer's supervisor to ensure completeness and to determine that the use of force was appropriate in accordance with policy, training, and equipment.

3. Whenever an officer's use of force results in the injury or death of another person, or when a department employee is directly involved in any traumatic incident resulting in the death or serious bodily injury of another, that employee will be reassigned at the direction of the Chief of Police to a non-operational assignment or placed on a non-punitive administrative leave, pending completion of an administrative review. During this period, the Chief of Police and the Peer Support Team will ensure that the employee undergoes a post incident evaluation conducted by a licensed mental health professional preferably experienced in working with law enforcement personnel.

4. At the end of each calendar year, the Training Division will conduct a documented annual analysis of all Use of Force Reports, to be forwarded to the Chief of Police. At the minimum the report will include:

a) Total number of incidents for the year.

b) Names of Department members involved.

c) Date, time, nature, and location of each incident.

d) Injuries that were sustained by officers and/or suspects, to include medical treatment.

e) Criminal charges filed, if applicable.

f) Levels and types of force utilized.

g) Trends or patterns related to age, race, and gender of suspects.

h) Training, equipment, and policy needs.

5. At the end of each calendar year, the Training Division will conduct a documented annual analysis of assaults on officers to determine trends or patterns, with recommendations to enhance officer safety, revise policy or address training issues.

6. Each calendar year an annual summary report of this analysis will be made available to the public.

7. FBI CJIS National Use of Force Reporting Data Collection

a) Any use of force meeting the following criteria shall be reported to the CJIS database:
1. Force resulting in death or serious injury to a person; or
2. Where an officer discharges a firearm at or in the direction of a person.

3. Where in a given month there are no use of force incident meeting this criteria, the department shall make a report of "0" incidents in the CJIS Database.

H. <u>ATTORNEY GENERAL NOTIFICATION PROTOCOL</u>

1. The protocol shall be followed whenever

a) A police officer uses deadly force, whether or not death or injury of any person results.

b) A person dies while in custody or dies during the apprehension or attempted apprehension of a person.

c) A police officer uses less than deadly force that results in serious bodily injury to any person.

d) The department receives a complaint alleging that a police officer used excessive force during his/her interaction with a person, and there is evidence, including but not limited to video or other electronic evidence, to warrant additional investigation.

2. The protocol may also be followed

a) Whenever a person dies or is injured as a result of a police interaction even if the police did not use force or deadly force. For example, motor vehicle accidents involving the police where there is a fatality or serious injury.

b) In any situation, not explicitly addressed above, where the police department and the attorney General jointly agree that the review by the Attorney General would be in the public interest.

**VI.    Responsibility**

a. It is the responsibility of all personnel to familiarize themselves and comply with this order.

Defendants- RFP- 000248

# Exhibit S: Plaintiff Mello medical record from Roger Williams Hospital (10/21/21)

Cranston Police Department
## Image Associated With Case Number 21-58022-AR
### Image Description: Roger Williams Med Ctr-Patient Information

*#21-58022-AR*                                    Page 1 of 6

 **Roger Williams**
M E D I C A L   C E N T E R

Patient: MELLO,JOSHUA J
Account Num: V036941944
Med Rec Num: M1432836
Location: ER ACUTE CARE
Physician: READY,ANDREW D.O.
Date: 10/21/21

## Patient Visit Information

**You were seen today for:**

Abrasion of forehead
Shoulder pain
Neck pain

### Staff

Your caregivers today were:

| | |
|---|---|
| Physician | READY,ANDREW D.O. |
| Nurse | D H |

### Patient Instructions Reviewed

Cervical Spine Strain
Abrasion

   received 10/21/21 - 1013

### Follow-up

Please contact the following to make an appointment for follow-up care:

   PATIENT DOES NOT HAVE A PCP

Note: Your health care plan may require a referral from your primary care provider prior to
making an appointment.

Cranston Police Department
Image Associated With Case Number 21-58022-AR
Image Description: Roger Williams Med Ctr-Patient Information

#21-58022-AR

Page 2 of 6


Roger Williams
MEDICAL CENTER

Patient: MELLO,JOSHUA J
Account Num: V036941944
Med Rec Num: M1432836
Location: ER ACUTE CARE
Physician: READY,ANDREW D.O.
Date: 10/21/21

## Cervical Spine Strain

### WHAT YOU SHOULD KNOW:

Cervical spine strain is when the tissues and muscles in your neck are stretched. It is called whiplash because it happens when your neck is quickly whipped forward and back. The pain may be sudden, or it may begin hours after the injury. Cervical spine strain is most commonly caused by a car accident or a contact sports injury.

### INSTRUCTIONS:

**Medicines:**
- **NSAIDs** help decrease swelling and pain or fever. This medicine is available with or without a doctor's order. NSAIDs can cause stomach bleeding or kidney problems in certain people. If you take blood thinner medicine, **always** ask your healthcare provider if NSAIDs are safe for you. Always read the medicine label and follow directions.

- **Acetaminophen:** This medicine decreases pain. It is available without a doctor's order. Ask how much to take and how often to take it. Follow directions. Acetaminophen can cause liver damage if not taken correctly.

- **Pain medicine:** You may be given medicine to take away or decrease pain. Do not wait until the pain is severe before you take your medicine.

- **Muscle relaxers:** This medicine helps relax your muscles. It is also given to decrease pain and muscle spasms.

- **Take your medicine as directed.** Call your healthcare provider if you think your medicine is not helping or if you have side effects. Tell him if you are allergic to any medicine. Keep a list of the medicines, vitamins, and herbs you take. Include the amounts, and when and why you take them. Bring the list or the pill bottles to follow-up visits. Carry your medicine list with you in case of an emergency.

Cranston Police Department
## Image Associated With Case Number 21-58022-AR
### Image Description: Roger Williams Med Ctr-Patient Information

#21-58022-An                                    Page 3 of 6



Patient: MELLO,JOSHUA J
Account Num: V036941944
Med Rec Num: M1432836
Location: ER ACUTE CARE
Physician: READY,ANDREW D.O.
Date: 10/21/21

---

**Soft collar:** You may need to wear a soft cervical collar to support your neck and hold it still. You may need to wear this collar for 7 to 10 days. By day 3, your primary healthcare provider may tell you to take the collar off for short periods of time. He may tell you to wear the collar less each day until you no longer need it.

**Self-care:**

- **Rest:** Avoid moving your neck as your injury heals. This will help decrease the risk of more damage to your neck. Gradually return to your normal activities. Stop if you have pain. Avoid activities that can cause more damage to your neck, such as heavy lifting or strenuous exercise.

- **Ice:** Ice your neck to help decrease swelling and pain. Put crushed ice in a plastic bag. Cover the ice bag with a towel and place it on your neck for 15 to 20 minutes every hour. Do this for as many days as directed.

- **Heat:** Apply heat to your neck for 15 to 20 minutes several times each day. You can alternate heat and ice to help with your pain.

- **Sleep:** Sleep without a pillow to help decrease pain. Instead of a pillow, you may roll a small towel tightly and place it under your neck. A soft collar may also help you sleep.

---

**Physical therapy:** You may need to see a physical therapist to teach you special exercises. These exercises help improve movement and decrease pain. Physical therapy can also help improve strength and decrease your risk for loss of function.

**Contact your primary healthcare provider if:**

- Your neck pain is getting worse.

- You have questions or concerns about your condition or care.

**Return to the emergency department if:**

- You have pain, numbness, tingling, or weakness of your arms, legs, face, or

# Cranston Police Department
## Image Associated With Case Number 21-58022-AR
### Image Description: Roger Williams Med Ctr-Patient Information

*#21-58022-Ar*

Page 4 of 6



Patient: MELLO,JOSHUA J
Account Num: V036941944
Med Rec Num: M1432836
Location: ER ACUTE CARE
Physician: READY,ANDREW D.O.
Date: 10/21/21

scalp.

● You have shortness of breath, a hoarse voice, or problems swallowing.

© 2014 Truven Health Analytics Inc. Information is for End User's use only and may not be sold, redistributed or otherwise used for commercial purposes. All illustrations and images included in CareNotes® are the copyrighted property of A.D.A.M., Inc. or Truven Health Analytics.

The above information is an educational aid only. It is not intended as medical advice for individual conditions or treatments. Talk to your doctor, nurse or pharmacist before following any medical regimen to see if it is safe and effective for you.

Cranston Police Department
Image Associated With Case Number 21-58022-AR
Image Description: Roger Williams Med Ctr-Patient Information

#21-58022-AR                    Page 5 of 6

 **Roger Williams**
M E D I C A L  C E N T E R

Patient: MELLO,JOSHUA J
Account Num: V036941944
Med Rec Num: M1432836
Location: ER ACUTE CARE
Physician: READY,ANDREW D.O.
Date: 10/21/21

---

### Abrasion

**WHAT YOU SHOULD KNOW:**

An abrasion is a scrape on your skin. It occurs when you fall and rub your skin against a rough surface, such as the ground, road, or sidewalk. It may also happen during a car or bike accident or if you slide across carpet with bare skin (rug burn). An abrasion may occur on any part of your body.

**INSTRUCTIONS:**

**Care for your abrasion:**
- **Clean and cover your wound:**

  o Clean all the debris, such as dirt or rocks, out of the wound. Any debris left in the wound may cause your skin to heal a different color from the rest of your skin.

  o You may need to use a bandage to keep germs out and help your wound heal. Use a large enough bandage to cover the entire wound. Keep the bandage smooth when you cover your wound. Wrinkles in your bandage may cause pain. Use a bandage that does not stick to your wound and has a spongy layer to absorb fluid. Clean your wound and change your bandage every day, or as directed. Also change it when it gets dirty, wet, or soaked in fluid from your wound.

- **Rub antibiotic ointment on your wound:** Your primary healthcare provider may tell you to gently rub a topical antibiotic ointment on your wound in between bandage changes. This will help prevent infection and help your wound heal faster. It may also keep the bandage from sticking to your wound. Ask which topical antibiotic ointment to use.

- **Elevate your wound:** You may be told to raise your injured body part above your heart. This will help reduce pain and swelling. You can use pillows to raise the injured area.

Defendants- RFP- 000034

Cranston Police Department
## Image Associated With Case Number 21-58022-AR
### Image Description: Roger Williams Med Ctr-Patient Information

*#21-58022-AR*

Page 6 of 6

# Roger Williams
### M E D I C A L   C E N T E R

Patient: MELLO,JOSHUA J
Account Num: V036941944
Med Rec Num: M1432836
Location: ER ACUTE CARE
Physician: READY,ANDREW D.O.
Date: 10/21/21

**Follow up with your healthcare provider as directed:** Write down your questions so you remember to ask them during your visits.

**Take your medicine as directed.** Call your healthcare provider if you think your medicine is not helping or if you have side effects. Tell him if you are allergic to any medicine. Keep a list of the medicines, vitamins, and herbs you take. Include the amounts, and when and why you take them. Bring the list or the pill bottles to follow-up visits. Carry your medicine list with you in case of an emergency.

**Contact your primary healthcare provider if:**
- You feel there is something stuck inside your wound, even after it heals.

- You have questions or concerns about the care of your abrasion.

**Return to the emergency department if:**
- You have painful swelling, redness, or warmth around your wound.

- You have pus leaking from your wound, or you have red streaks on your skin.

© 2014 Truven Health Analytics Inc. Information is for End User's use only and may not be sold, redistributed or otherwise used for commercial purposes. All illustrations and images included in CareNotes® are the copyrighted property of A.D.A.M., Inc. or Truven Health Analytics.

The above information is an educational aid only. It is not intended as medical advice for individual conditions or treatments. Talk to your doctor, nurse or pharmacist before following any medical regimen to see if it is safe and effective for you.

Defendants- RFP- 000035

# Exhibit T: Plaintiff Mello medical record from Garden City Treatment Center (10/24/21)

Name: **Mello, Joshua J**
DOB: **3/18/1975**
Chart: **246084**
Age: **46 year old male**
Date: **10/24/2021**



GARDEN CITY
TREATMENT CENTER



**PATIENT INSTRUCTIONS:**

Left Rib Contusion

Medication escripted to CVS 681 Reservoir Ave
Cranston.

- Naprosyn - Take 1 tablet 2 times a day
as needed with food

Ice area 3 times a day for 15 minutes each time for
3 days.
Every 1-2 hours while awake take a deep breath +
cough.
Any shortness of breath, cough, or fever be evaluated right away.
Information Provided

**CONDITION ON DISCHARGE:** ☐ SAME    ☐ IMPROVED    ☐ EXPIRED    ☐ HOSPITAL
**TRANS. ON DISCHARGE:** ☐ AMBULANCE/RESCUE    ☐ AMBULATORY    ☐ WHL CHR    ☐ REL/FRIEND'S CAR

YOUR TREATMENT HAS BEEN PROVIDED ON AN **EMERGENCY BASIS ONLY.**
IF SYMPTOMS DO NOT IMPROVE AFTER 2-3 DAYS OR **IF SYMPTOMS WORSEN**, FOLLOW-UP AT GCTC, THE HOSPITAL, OR WITH YOUR PCP FOR A REEVALUATION ASAP

_____          _____          _____
**MD/NP'S SIGNATURE**                      **RN'S SIGNATURE**                          **PATIENT'S SIGNATURE**

**CLINICAL SUMMARY TO PATIENT**
**PLEASE BRING TO PCP**

**YOU** HAVE BEEN **PRESCRIBED** Naprosyn
A **SIMILAR** MEDICATION TO THOSE **SOLD**
OVER THE COUNTER AS ANTI-INLAMMATORY.
DO NOT TAKE ADDITIONAL MOTRIN, ADVIL,
ALEVE, OR ASPRIN. 1 DAILY DOSE
OF **ASPRIN** AS ORDERED BY YOUR PHYSICIAN
IS **PERMITTED**.

| Name | Joshua Mello | Document Created | Oct 24, 2021 |
|---|---|---|---|
| Patient ID | 246084 | Location: | Garden City Treatment Center |
| Encounter Date | Oct 24, 2021 | | |
| Encounter Provider | Garden City Treatment Center, Inc | Address: | 1150 Resevoir Avenue Suite 100 Cranston, RI, 02910 |
| | | Phone: | (401) 946-2400 |

## Demographics

| Address | 37 Lafayette St Providence, RI, 02919 | Race | White |
|---|---|---|---|
| Phone | Home: (401) 426-0778 Work: Fax: | Ethnicity Preferred Language | eng (ISO639-2) |
| Email: | @ | | |
| Birthdate | Mar 18, 1975 | | |
| Sex | Male | | |

## Diagnoses

| Description | Status | Code | Diagnosis Date | Last Modified Date | Type | Source |
|---|---|---|---|---|---|---|
| Contusion of left front wall of thorax, initial encounter | Active | 428016006 (SNOMED-CT) | Oct 24, 2021 | Oct 24, 2021 | Diagnosis | SRS EHR by SRSsoft. (EHR) |

## Vital Signs

| Date | Height/Length | Weight | BMI | Blood Pressure |
|---|---|---|---|---|
| Oct 24, 2021 | 67.00 in | 210.00 lbs | 32.9 | 117 / 77 |

## Medications Administered During Visit

| Drug Name | Code | Date | Dosage | Strength | Route | Quantity | Status |
|---|---|---|---|---|---|---|---|
| No Data Available | | | | | | | |

## Medications

| Drug Name | Code | Date | Form | Strength | Route | Quantity | Refills | Instruction | Status | Source |
|---|---|---|---|---|---|---|---|---|---|---|
| Naprosyn | 105899 (RxNorm) | Oct 24, 2021 | tablet | 500 mg | by mouth | 20 | 0 | Take 1 tablet by mouth twice a day . | Active | SRS EHR by SRSsoft. (EHR) |

## Immunizations

| Vaccine | Disposition | Route | Site | Code | Date | Lot# | Manufacturer Name | Amount/Unit | Source |
|---|---|---|---|---|---|---|---|---|---|
| No Data Available | | | | | | | | | |

## Allergies

| Type | Code | Date | Description | Agent | Reaction | Status | Source |
|---|---|---|---|---|---|---|---|
| No Data Available | | | | | | | |

## Social History

| Description | Status | Code | Start Date | Quit Date | Source |
|---|---|---|---|---|---|
| No Data Available | | | | | |

## Procedures

| Procedure | Code | Date | Disposition | Source |
|---|---|---|---|---|
| No Data Available | | | | |

## Results

| Test | Date | Status | Source |
|---|---|---|---|
| No Data Available | | | |

## Care Team

| Provider Name | Provider Contact Information | Role |
|---|---|---|
| Garden City Treatment Center, Inc | | |

## Plan of Care

### Care Plan

| Notes | Date |
|---|---|
| None Specified | |

### Diagnostic Tests Pending

| Description | Code | Date |
|---|---|---|
| No Data Available | | |

### Future Appointments

| Provider | Date | Location |
|---|---|---|
| No Data Available | | |

### Future Scheduled Tests

| Description | Code | Date |
|---|---|---|
| No Data Available | | |

### Future Scheduled Procedures

| Description | Code | Date |
|---|---|---|
| No Data Available | | |

## Referral to Providers

| Provider Name | Provider Contact Information |
|---|---|
| No Data Available | |

## Reason for Visit

| Date | Reason |
|---|---|
| No Data Available | |

## Instructions

### Recommended Patient Decision Aids

Patient was supplied with educational material on:

No Data Available

### Clinical Instructions

| Instruction | Date |
|---|---|
| No Data Available | |

Electronically generated by SRS EHR

# Exhibit U: Defendant, Edward Arruda's Response to Plaintiffs' Second Set of Interrogatories

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JOSHUA MELLO and RACHEL WARE,
*Plaintiffs,*

vs.

DEREK GUSTAFSON, TIMOTHY VESEY,
STEVEN CATALANO, JOHN ROCCHIO and
EDWARD ARRUDA
*Defendants*

C.A. No. 1:23-cv-00480-JJM-PAS;
1:23-cv-00479-JJM-PAS

### DEFENDANT, EDWARD ARRUDA'S RESPONSE TO PLAINTIFFS' SECOND SET OF INTERROGATORIES

*These interrogatories exceed the limit of interrogatories permitted by Rule 33 of the Federal Rules of Civil Procedure. Moreover, the subparts contained in Interrogatory Nos. 14, 15, 20, 21, 22, 24, and 25 exceed the twenty-five (25) interrogatories allowed by Rule 33. Since Plaintiffs have not received permission from the Court as required under Rule 33 to propound additional interrogatories, Defendant has provided objections to Interrogatory Nos. 22, 23, 24, and 25, to preserve his objections, but did not provide responses to Interrogatory Nos. 22, 23, 24, and 25 since Interrogatories Nos. 22, 23, 24, and 25 go above the twenty-five (25) interrogatories permitted by the Federal Rules of Civil Procedure.*

11.    Please provide a list and description of any disciplinary actions against Cranston Police Department officers involved in the October 21, 2021, incident, as well as any subsequent investigations involving Plaintiffs. This request includes closed and prior investigations, as the information is relevant to potential patterns of behavior or accountability practices within the department as permitted by *Monell v. Dept. of Soc. Servs.* for establishing liability through policies or customs of misconduct.

**RESPONSE: Objection. Defendant objects based on proportionality and relevance. Defendant objects to the confusing nature of this interrogatory. Defendant objects based on the form of this interrogatory. Notwithstanding and without waiving the objections, I was not disciplined as a result of the October 21, 2021, or any subsequent investigations involving the Plaintiff. I am unaware that any other Cranston Police Department officers were disciplined as a result of the October 21, 2021 incident, or any subsequent investigations involving Plaintiffs.**

12.    Identify and internal or external investigations, audits, or reviews conducted by the Cranston Police Department or any other governmental entity regarding the events of October 21, 2021, or the allegations in the Plaintiffs' complaint. Such information is critical under *Graham v. Connor* to access departmental standards and scope of any review conducted, as these details may impact determinations of liability and damages.

*Mello, et al, v. Derek Gustafson, et al*
*C.A. No. 23-cv-000480-JJM-LDA*

**RESPONSE: Objection. Defendant objects based on proportionality and relevance. Defendant objects to the confusing nature of this interrogatory. Defendant objects based on the form of this interrogatory. Notwithstanding and without waiving the objections, I am only aware of the investigation related to Plaintiffs' complaints made to the Cranston Police Department's Office of Professional Standards, C.A. No. 2023-12-IA, which was attached to Defendants' Response to Plaintiffs' Request for Production of Documents, Bates numbered documents, Defendants-RFP-000075 through 000137. Otherwise, I am not aware of any other internal or external investigations, audits, or reviews conducted by the Cranston Police Department or any other governmental entity regarding the events of October 21, 2021.**

13.    State whether officer Edward Arruda knows any of the following individuals: Leanne D'Allesandro Ciccarelli, Damian Ciccarelli, Joe Ciccarelli, Angelo Ciccarelli, Janet Antonelli, Tonya Morena, or Crystal Gervais. If so, please describe the nature, context, and duration of these relationships. This request seeks information to assess potential biases or conflicts of interest, which may be pertinent to civil rights claims under *Monell* regarding accountability within the department.

**RESPONSE: Objection. Defendant objects based on proportionality and relevance. Defendant objects to the vague, ambiguous, and confusing nature of this interrogatory, specifically, the terms "know," "nature," "context," and "relationships" are vague, ambiguous, and confusing. Defendant objects to the term "relationships" as it assumes facts that may be in dispute.   Defendant objects to the form of this interrogatory. Notwithstanding and without waiving the objections, I do not know and/or have had so-called "relationships" with Damian Ciccarelli, Joe Ciccarelli, Angelo Ciccarelli, or Crystal Gervais. Moreover, I am not social friends, but I have encountered the following individuals:**

> **Leanne D'Allesandro Ciccarelli: Ms. D'Allesandro Ciccarelli is employed at my dentist's office, Ocean State Dental Group as a receptionist. I see Ms. D'Allesandro whenever I go get my teeth cleaned or need other dental work. I am unsure of how long she has been employed at Ocean State Dental Group, but I have been going to my dentist's office for around twenty (20) years. Ms. Allesandro Ciccarelli and I are Facebook friends, but we have no communication outside of her scheduling my dental appointments and I see her when I attend my dental appointments.**

> **Janet Antonelli: Ms. Antonelli was the Principal at George Peters Elementary School who started in the 2019-2020 school year while I was assigned to that school as a School Resource Officer. Ms. Antonelli and I worked together from the 2019 - 2020 school year until I was assigned to Cranston West High School resource officer in 2020.  I have not spoken to Ms. Antonelli since I was assigned to Cranston West High School.**

*Mello, et al, v. Derek Gustafson, et al*
*C.A. No. 23-cv-000480-JJM-LDA*

**Tonya Morena: Ms. Morena is Plaintiff Mello's daughter's mother. I spoke with Ms. Morena on October 21, 2021 during the incident with Plaintiff Mello and Plaintiff Ware.**

14.    Please describe in detail the meaning of "I grabbed Mr. Mello, I put him head to head and I slowly descended to the floor, I took him down," specifically clarifying what "head to head" refers to, the technique used, and how you executed a "slow descent" while restraining Mr. Mello. Additionally, describe any standard Cranston Police Department procedures or training techniques followed during this action. This clarification is essential under *Graham v. Connor* to determine if reasonable force standards were met.

**RESPONSE: Objection. Defendant objects to the confusing nature of this interrogatory. Defendant objects to the multi-part nature of this interrogatory. Defendant objects to the form of this interrogatory as it seeks information that calls for speculation. Defendant objects to this interrogatory as it seeks information regarding facts that may be in dispute. Defendant objects based on the vague and confusing nature of this interrogatory as it does not provide any context or information regarding the quote, "I grabbed Mr. Mello, I put him head to head and I slowly descended to the floor. I took him down." Notwithstanding and without waiving the objection, since the interrogatory fails to provide any context or information regarding the statement, "I grabbed Mr. Mello, I put him head to head and I slowly descended to the floor, I took him down," I am unable to describe and/or clarify any part of the statement. Also, without context or information regarding the statement, "I grabbed Mr. Mello, I put him head to head and I slowly descended to the floor, I took him down," I am unable to describe any Cranston Police Department procedures or training following during this action.**

15.    During the November 15, 2022 trial, you testified that you initially took Mr. Mello to the ground "head to head" but later ended up near his feet. Please provide a detailed explanation of how this transition occurred. The information is pertinent to assessing use of force techniques in compliance with *Graham v. Connor* standards on reasonableness.

**RESPONSE: Objection. Defendant objects to the confusing nature of this interrogatory since there is no context or further information regarding the phrase "you testified that you initially took Mr. Mello to the ground 'head to head' but later ended up near his feet." Defendant objects to the extent that that this interrogatory seeks information regarding facts that may be in dispute. Defendant objects to the form of this interrogatory as it calls for speculation. Notwithstanding and without waiving the objections, since there is no information or context regarding the phrase "you initially took Mr. Mello to the ground 'head to head' but later ended up near his feet," I am unable to provide a detailed explanation of how any transition occurred.**

16.    In your testimony on November 15, 2022, you stated, "Mr. Mello threw out 'I can't breathe,' so I got off him. Not that I was on his back, but I was on his shoulders. I wasn't I knew we were being videotaped and how it would look, so I got off of him." Please explain the meaning of "I knew we were being videotaped and how that would look," and specify whether it is Cranston Police Department protocol to modify officer behavior based on awareness of being

*Mello, et al, v. Derek Gustafson, et al*
*C.A. No. 23-cv-000480-JJM-LDA*

recorded. This inquiry addresses developmental practices related to transparency and public accountability under *Monell*.

**RESPONSE: Objection. Defendant objects based on relevance and proportionality. Defendant objects to the confusing nature of this interrogatory since there is no context or further information regarding the statement, "Mr. Mello threw out 'I can't breathe,' so I got off him. Not that I was on his back, but I was on his shoulders. I wasn't I knew we were being videotaped and how that would look." Defendant objects to the extent that this interrogatory may assume facts that are in dispute. Defendant objects to the form of this interrogatory as it calls for speculation. Not withstanding and without waiving the objection, since this interrogatory fails to provide any information or context regarding the statement, "Mr. Mello threw out 'I can't breathe,' so I got off him. Not that I was on his back, but I was on his shoulders. I wasn't I knew we were being videotaped and how that would look," I am unable to explain the meaning of "'I knew we were being videotaped and how that would look." However, I have no knowledge of a Cranston Police Department "protocol to modify officer behavior based on awareness of being recorded."**

17.    During the trial, Mr. Catalano asked, "You weren't on his neck, were you?" and subsequently followed with, "So, was this some type of George Floyd situation?" Please explain why you believe this analogy was made regarding your actions, as this may clarify public perceptions of Cranston Police Department's use-of-force protocols.

**RESPONSE: Objection. Defendant objects based on relevance and proportionality. Defendant objects to the vague and confusing nature of this interrogatory. Defendant objects to the form of this interrogatory as it calls for speculation. Defendant objects to the extent that this interrogatory seeks information related to facts that may be in dispute. Based on the wholly speculative nature of this interrogatory, I cannot provide a complete response regarding Mr. Catalano's reasoning for making any such analogy referred to in this interrogatory.**

18.    In a statement to Captain Parker from the Office of Professional Standards, you indicated that another person handled knives found on Mr. Mello. Please confirm whether this remains your understanding, and if you recollection has changed, explain any involvement you had with these knives. This question relates to assessing factual consistency in officer statements, critical to departmental accountability under *Monell*.

**RESPONSE: Objection. Defendant objects based on relevance and proportionality. Defendant objects to the extent that this interrogatory is vague and confusing. Defendant objects to the extent that this interrogatory seeks information related to facts that may be in dispute. Defendant objects to the form of this request. Defendant objects to the extent that this interrogatory seeks information that calls for speculation. Defendant objects to the multi-part nature of this interrogatory. Defendant objects to the extent that this interrogatory assumes facts that may be in dispute. Notwithstanding and without waiving the objections, without specific information related to the "statement to Captain Parker from Officer of Professional Standards," I am unable to determine specific "statement"**

4

**that the interrogatory is referring to, and I am further unable to provide a complete
response to this interrogatory. However, I did not have any involvement with any knives
that were related to the incident that took place on October 21, 2021.**

19.    Please confirm whether you reviewed the surveillance video from Western Hills School
on the morning of October 21, 2021. If so, please describe your purpose for reviewing the video
and any observations made. Understanding the information available to officers post-incident is
relevant to evaluating the completeness of internal reviews in compliance with federal civil
rights standards.

**RESPONSE: Objection. Defendant objects based on relevance and proportionality.
Defendant objects to the extent that this interrogatory is vague and confusing. Defendant
objects to the form of this interrogatory.  Notwithstanding and without waiving the
objections, I reviewed the surveillance video from Western Hills Middle School that was
taken on October 21, 2021. I remember reviewing the video with a Western Hills Middle
School Administrator, but I cannot remember what observations are made.**

20.    If Mr. Mello's actions had mirrored those of a female counterpart during the same
incident, would the physical engagement, include any use of force, have remained consistent.
Provide any related Cranston Police Department policies or training guidelines regarding
engagement based on gender. This question pertains to potential biases in the application of force
and relates to equal protection concerns under civil rights law.

**RESPONSE: Objection. Defendant objects based on relevancy and proportionality.
Defendant objects based on the confusing nature of this interrogatory. Defendant objects to
the multi-part nature of this interrogatory. Defendant objects to the extent that this
interrogatory assumes facts that may be in dispute. Defendant objects to the form of this
interrogatory as it seeks information that calls for speculation. Notwithstanding and
without waiving the objection, due to the highly speculative nature of this interrogatory, I
cannot reasonably provide a response.**

21.    After receiving the child's mother's permission for release, under what legal authority did
the Cranston Police Department prevent Mr. Mello from accessing his child? Please identify
applicable policies and protocols that guide decisions on restricting a parent's access to a child
during a situation, as these relate to accessing departmental decision-making and adherence to
procedural justice standards under *Monell*.

**RESPONSE: Objection. Defendant objects based on relevancy and proportionality.
Defendant objects based on the confusing nature of this interrogatory. Defendant objects to
the multi-part nature of this interrogatory. Defendant objects to the form of this
interrogatory as it seeks information that calls for speculation. Defendant  objects to the
extent that this interrogatory calls for a legal conclusion that is outside the scope of
discovery. Defendant objects to the extent that this interrogatory assumes facts that may be
in dispute. Notwithstanding and without waiving the objection, to my knowledge, since
Plaintiff Mello's belligerent and irate behavior did not de-escalate after he was told that his
daughter's mother was going to "allow him" to take his daughter, Principal Vesey told**

*Mello, et al, v. Derek Gustafson, et al*
*C.A. No. 23-cv-000480-JJM-LDA*

Plaintiff that he could take his daughter once he calmed down for the safety of Plaintiff Mello's daughter. Officer Rocchio and myself repeated that several times to Plaintiff.

22.     In your interview with Captain Parker, you stated that you relied on a school administrator's representation that a court document was valid without reviewing it yourself. Please explain why Mr. Mello's on-site challenge to this document did not prompt further verification. Additionally, provide any CPD policies or training on assessing the validity of legal documents in situations where an individual disputes them, in line with protocols under *Monell* regarding accountability and adherence to proper procedural review.

**RESPONSE: Objection. Defendant objects based on relevancy and proportionality. Defendant objects based on the form of this interrogatory seeks information that calls for speculation. Defendant objects to the extent that this interrogatory seeks information that may be in dispute. Defendant objects to the confusing nature of this interrogatory as this interrogatory seeks information regarding a statement that I made to Captain Parker without any context or further information regarding that statement.**

23.     Identify who with in the Cranston Police Department is responsible for classifying reports as either 'first report' or 'supplemental report,' and explain any policies or procedures that govern this classification. If no policy exists, please state that clearly.

**RESPONSE: Objection. Defendant objects based on relevance and proportionality. Defendant objects to the vague and confusing nature of this interrogatory. Defendant objects to the extent that based on the multi-part nature of Interrogatory Nos. 14, 16, and 20, this interrogatory exceeds the number of allowed interrogatories permitted by Rule 33 of the Federal Rules of Civil Procedure.**

24.     Explain why Officer Arruda, who was the first responding officer on October 21, 2021, labeled his report as a 'supplemental report,' while Officer Rocchio, who arrived later, labeled his report as the 'first report.' Include in your responses any instructions or directives provided to either officer regarding the classification of their reports.

**RESPONSE: Objection. Defendant objects based on relevance and proportionality. Defendant objects to the vague and confusing nature of this interrogatory. Defendant objects to the multi-part nature of this interrogatory. Defendant objects to the extent that based on the multi-part nature of Interrogatory Nos. 14, 16, and 20, this interrogatory exceeds the number of allowed interrogatories permitted by Rule 33 of the Federal Rules of Civil Procedure.**

25.     Explain in detail the rationale behind labeling Officer Rocchio's report as the 'Officers First Report' and Officer Arruda's report as the 'Officers Supplemental Report,' despite Officer Arruda's position as the first responder to the scene and his prolonged presence at the incident on October 21, 2021. Describe any Cranston Police protocols or procedures that support this labeling decision.

*Mello, et al, v. Derek Gustafson, et al*
*C.A. No. 23-cv-000480-JJM-LDA*

**RESPONSE:** Objection. Defendant objects based on the Rhode Island Law Enforcement Officers' Bill of Rights, to providing information on the subject of open investigations, if any, and those that have been closed after finding of innocence, unfounded, not sustained, and/or exonerated. Defendant objects to the extent that this interrogatory is vague and confusing as it includes no limitation as to time after the incident. Notwithstanding and without waiving the objection, I communicated with Officer Rocchio before the incident, during the incident, and after it occurred. I also communicated with my supervisors and the other Cranston Police Officers involved in Plaintiff's arrest after his arrest.

10. Describe any medical treatment you received related to the incident.

**RESPONSE:** Objection. Defendant objects based on relevance and privacy according to the personal privileged and confidential healthcare records of the Defendant. Notwithstanding and without waiving the objection, none.

Edward Arruda

**STATE OF RHODE ISLAND**
**COUNTY OF** _Providence_

*Subscribed and sworn to before me on this* 27 *day of* November *of 20*24

NOTARY PUBLIC
My Commission Expires

MARK R. CAMPOPIANO
NOTARY PUBLIC
ID - 48155
MY COMMISSION EXPIRES
08/19/2028

Defendants

6

*Mello, et al, v. Derek Gustafson, et al*
*C.A. No. 23-cv-000480-JJM-LDA*

<u>CERTIFICATION</u>

    I further certify that a true and accurate copy of the within was emailed and mailed, postage prepaid on the 28th day of November, 2024 to:

Joshua Mello                      Rachel Ware
57 Rolfe Square, Unit 10113      57 Rolfe Square, Unit 10113
Cranston, RI 02910             Cranston, RI 02910
kskustomsrideons@gmail.com     kskustomsrideons@gmail.com

*/s/ Julia K. Scott- Benevides* _____

9

# Exhibit V: Exhibits A-O for Motion for Judicial Notice

# Exhibit A

Wrist grab by Officer Rocchio



# Exhibit ☒

Officer Rocchio has Plaintiff Mello☒ wrist and arm.
Plaintiff Ware is touching Plaintiff Mello.



# Exhibit C

Officer Arruda⊠ engagement begins



# Exhibit D

Officer Rocchio still has a hold of Mello☒ arm
Officer Arruda continues to engage



Exhibit E



Exhibit F



Exhibit G



# Exhibit H



# Exhibit I

Officer Arruda beings the choke hold and or kneck restraint on Plaintiff Mello



Exhibit J



Exhibit K



# Exhibit L



# Exhibit M



# Exhibit N



Exhibit O



# Exhibit X: Cranston PD Arrest and Assault video still images

Timestamp: 0 seconds



Timestamp: 5 seconds



Timestamp: 10 seconds





# Key Timestamp: 9.6 seconds



# Exhibit Y: Still images from WHMS Surveillance Video





